Thomson, J.,
delivered the opinion of the court.
On the 24th day of October, 1891, the Gates Iron Works and The Emmons Mining Company entered into an agreement in writing as follows:
“ This agreement, made and entered into at the city of Denver, county of Arapahoe and state of Colorado, this 24th day of October, A. D. 1891, between the Gates Iron Works, a corporation of the state of Illinois, doing business at the city of Chicago, in said state, party of the first part, *342 and. The Emmons Mining Company, a corporation of the state of Colorado, having an office in the city of Denver, in said state, party of the second part,
“ Witnesseth, That the party of the first part agrees to furnish the machinery for a concentrating plant, having capacity of fifty (50) tons in twenty-four (24) hours, for the sum of twelve thousand five hundred ($12,500) dollars, f. o. b. Chicago. Said sum to include also the services of a man to superintend the erection and starting of the plant.
“ The items of machinery to be furnished under this agreement are as follows:
“ 1 No. 2 Gates rock breaker.
“ 1 chain ore drier.
“ 1 set Gates improved Cornish rolls, with lathe.
“ 1 set extra shells for above rolls.
“1 sizer, 80 mesh.
“ 5 Card concentrators.
“ 10 Gates wet slime concentrators.
“ 2 40 horse power half arch front standard tubular boilers.
“ 1 50 horse power stationary engine, for crusher, etc.
“ 1 20 horse power detached portable engine for concentrators.
“ Feed-water pump, heater, piping, shafting, hangers, pulleys, belting, etc., to make a complete plant.
“ That the party of the first part also agrees to furnish full plans and specifications for the mill.
“ That the party of the first part guarantees to save eighty (80) per cent of all the concentrating values in the ore in the shape of galena, argentiferous galena, iron and copper pyrites, native silver, native gold, and any mineral or metal which is possible of concentration, wet or dry, by any machine — it being understood that the ore is to be treated as a concentrating problem and in no sense as a free milling proposition.
“ That the party of the second part agrees to pay the said sum of twelve thousand five hundred dollars ($12,500) in cash when the plant is completed and successfully fulfilling *343 the conditions of the above guarantee, and further agrees, when the order is given to put up as security in escrow, a sufficient amount of the stock of The Emmons Mining Company at 45 cents per share as earnest to secure the payment as above.
“ The party of the first part is to ship the machinery in its own name and to hold possession of same until payment of cash, as above provided, and if the said party shall fail to make the payment in cash, as above provided, upon said conditions, then said first party shall have the right to sell the stock put up as security in the market and apply the proceeds on its claim.
“ That the party of the second part agrees to push the construction of the mill as rapidly as possible, and to use every reasonable effort to complete the work as per accepted plans.
“ The party of the second part further agrees to furnish the ore as soon as the plant is completed, so that the tests can be made.
“ Executed in duplicate.
“ Witness the signatures of W. L. Card for the Gates Iron Works of Chicago, as per their written authority, and of the president of The Emmons Mining Company, attested by the secretary thereof, under their cox-porate seal.
“ Gates Iron Works,
“ By W. L. Card, Agent.
[seal] “ The Emmons Mining Co.,
“ By George F. Batohelder, President.
“Attest:
“ F. Pt. Miller, Secretary.”
Afterwards, on the 16th day of December, 1891, the parties entered into a supplementary agreement, which, after reciting an experiment made upon the ore of the Mining Company by W. L. Card, the agent of the Iron Works, resulting, as Card reported, in a saving of ninety-one per cent of concentrating values, contained the following provi« sions:
*344 “ It is therefore understood and agreed that the method used by Mr. W. L. Card in his foregoing report of the test to show a saving of ninety-one per cent of all values in said ore, which are possible of concentration, shall be used in determining whether said contemplated mill fulfills the condition of saving eighty per cent of such values, and if said mill shall reduce and concentrate fifty (50) tons (of 2,000 pounds) of said ore per day (twenty-four hours), and shall save eighty per cent of the values, to be determined by said agreed upon method, then it shall be considered to have fulfilled the conditions of the attached agreement, and the twelve thousand five hundred ($12,500) dollars therein named shall be due and payable at once.”
The shipments of the machinery commenced in the summer of 1892, and continued until the following October or November. It was put in place under the supervision of David Cole, an agent of the Iron Works. It was placed in a building belonging to the company, upon the company’s land, and although not attached to the walls of the building, it, together with its framework of heavy timbers, rested on, and was fastened to, a foundation of solid masonry, constructed for the purpose. This manner of placing it was necessary to enable it to undergo the tests to which it was to be subjected.
After the concentrating mill was completed, and had been at least partly tested, Samuel Cohen, the appellee, brought suit against the company, in which he caused a writ of attachment to be issued and levied upon the machinery, and also upon the land on which the machinery stood. The Iron Works intervened, claiming the ownership and right of possession of the machinery, and praying judgment accordingly. The answer of the plaintiff put in issue the material allegations of the petition, averred a want of compliance by the intervenor with the provisions of our statute prescribing the conditions upon which foreign corporations are authorized to do business in this state, and alleged that the machinery was attached to the land and buildings in such manner as to constitute it part of the realty, so that it was embraced in the *345 levy upon the land, and the intervenor was precluded from claiming it as personal property.
The evidence was that after the completion of the mill some tests were made. The largest quantity of ore handled in twenty-four hours was thirty-one tons. What percentage of the ore values was saved was not shown, but the undisputed evidence was that it did not nearly reach the requirements of the agreement. The mill was used for no other purpose than that of making these tests. It was never accepted by the Mining Company, and at the time of the levy the final test to determine its ability to perform the work for which it was intended had not yet been made. The mill was insured dining the whole time in the name of the intervenor, and was most of the time in charge of its agent. The plaintiff testified that when the attachment was levied he had no knowledge of the contracts between the intervenor and the company; but he also testified that prior to his attachment he had conversations with Mr. Cole, the intervenor’s agent, and Mr. Webber, the company’s superintendent, on the subject of the ability of the mill to treat the ore, in which he was possibty told, but did not recollect whether he was or not, that the machinery was there for the purpose of being tested to ascertain its sufficiency for that purpose. In his talk with Mr. Webber, he recommended another machine which he thought would do the work better. There was no material controversy over the facts, and upon the evidence the court made the following special findings:
“ 1. That there was a conditional sale of the property in question by intervenor, the Gates Iron Works, etc., to the defendant, The Emmons Mining Company.
“2. That the machinery herein in dispute was and is so affixed to certain realty belonging to said The Emmons Mining Company, and that it was so affixed thereto under such circumstances and conditions and for such purposes that, so far as plaintiff’s rights against said machinery, as an attaching creditor of the said The Emmons Mining Company, for the various amounts involved in the main suit, be concerned, *346 it, said machinery, became, was and is part and parcel of said realty.
“8. That plaintiff acquired an attachment lien upon and against said realty, including the property herein in dispute, fur a Iona fide debt due him from said Emmons Mining Company, before he had any notice, either constructive or actual, of intervenor’s alleged ownership and right to the possession of the property herein in controversy.
“ 4. That the agreement between the intervenor, the Gates Iron Works, and the defendant, The Emmons Mining Company, in relation to the property herein in dispute, whatever may be its force and effect between the parties thereto, was and is not good against or binding upon said plaintiff, after said property became affixed, as aforesaid, to a part of the realty of said company, and after said plaintiff had obtained, as he did, an attachment lien thereon, without notice of that agreement or any claim at all of the Gates Iron Works in and to said property.
“5. To make out a case against plaintiff, the attaching creditor, with an attachment lien already secured on the property in dispute as realty, it was and is incumbent upon the intervenor to establish, affirmatively, not only his ownership and right to the possession of the disputed property, as against the attachment debtor, under the agreements upon which he relies, but also that attachment plaintiff had notice of said agreements, either constructive or actual.”
Judgment was rendered upon these findings in favor of the plaintiff, from which the intervenor appealed.
The first question to be considered relates to the status of the title to the property in controversy, as between the intervenor and the Mining Company. The language of the contracts is not as lucid and free from obscurity as it might have been, but we think that taking them together, and considering them in the light of the surrounding facts, we shall be able without much'difficulty to discover the intentions of the parties to them. The intervenor agreed to furnish a concentrating mill to the Mining Company, which would *347 reduce a certain amount of ore every twenty-four hours, and save a certain percentage of its value. ' The Mining Company agreed to pay for the mill if, upon being tested in accordance with a certain specified method, it proved itself capable of doing the work required. The object of the company obviously was to obtain a concentrator which would handle its ores with a certain amount of expedition, and without losing more than a certain proportion of their value. Tests were necessary to determine whether this machinery would accomplish the desired purpose, and until it should establish its ability to do so, there was no obligation upon the company to take it or pay for it. The contracts amounted to an agreement on the part of the intervenor to sell, and on the part of the company to buy, the machinery, provided it should, upon being subjected to the proper tests, reduce the amount and save the value specified. When it should demonstrate its ability to do this, the result would be to pass the title out of the intervenor, and fix the liability of the company ; but until that time the title would remain in the intervenor, and whatever possession the company might have in the property would be that of bailee and not of owner. At the time of the levy it had not fulfilled the conditions of the agreement, no new contract had been made, the company had not accepted it, and as between the company and the intervenor it belonged to the latter.
The next question in the case is whether the company by any of its acts or omissions, in the course of the transaction, had precluded itself from asserting its title as against the attachment plaintiff. The court found that at the time of the levy, the plaintiff had no notice of the intervenor’s title or right of possession, and that by reason of the manner in, and the circumstances under, which the machinery was affixed to the land, as between the intervenor and the plaintiff, it became a part and parcel of the real estate, so that the lien which he acquired by levying his attachment upon the land embraced and held the machinery. It is to these findings of the court that the argument on both sides is principally directed.
*348 If the controversy were between the intervenor and a purchaser of the real estate for value, and without notice of the i liter venor’s claim, the question whether, under the facts in evidence, his purchase would embrace the machinery as part of the realty, might be troublesome; but a party whose only claim upon the property arises from the levy of an attachment, occupies a different position in relation to the title. He has parted with no value. If his levy fails of its purpose, he sustains no loss, and is in no worse position than he occupied before the attachment; so that the reasons for extending protection to innocent purchasers, who have parted with their money upon the faith of an apparent title, do not apply to his ease. In the absence of statutory provision to the contrary, an attachment can operate only upon the title which the defendant actually has when the attachment is made. The lien of an attachment or of a judgment binds the property upon which it operates against any subsequent act of the defendant, but it does not affect rights in third persons outstanding at the time it is acquired. Drake on Att., sec. 284; Savery v. Browning, 18 Iowa, 246 ; Reed v. Ownby, 44 Mo. 204; Brown v. Pierce, 7 Wall. 205; Dix v. Cobb, 4 Mass. 508 ; Welton v. Tizzard, 15 Iowa, 495; Davis v. Ownby, 14 Mo. 170; Pom. Eq., secs. 685, 720.
By the terms of our statute concerning conveyances, instruments in writing affecting title to real estate do not take effect as to subsequent bona fide purchasers, or incumbrancers by mortgage, judgment or otherwise, not having notice thereof, until they are filed for record in the office of the recorder of the county in which' the real estate is situate. General Statutes, see. 215.
By these statutory provisions the lien of an attachment would take precedence of an outstanding interest in the land, where such interest is evidenced by an unrecorded deed or contract of which the attachment or judgment creditor had no notice. The statute changes a rule which, prior to its passage, was of universal application, so as to place attachment and judgment creditors upon the same footing with *349 purchasers, in respect of land, a legal or equitable interest in which has been conveyed, but the deed not recorded. The purchase made, or the attachment or judgment lien acquired, without notice of the unrecorded conveyance, will prevail against the outstanding title. But the statute stops there. It makes no further innovation. . Except in the instance specified, the law remains as it was.
Counsel undertake to reason from that statute to this case ; but the attempt is necessarily abortive, because there is no conceivable analogy between a case like this and one to which the statute was intended to apply. The contracts here related to personal property and not to real estate. The machinery was shipped by the intervenor and placed upon the land of the Mining Company for the purpose, first, of proving its fitness for the work required by the company; and, second, if the experiment should be successful, of selling it to the company. At the time of the attachment there had been no sale to the company. The intervenor had never parted with its title even conditionally. Until a sale should be completed, the machinery remained personal property. As between the parties, it is immaterial how firmly it was affixed to the land; it became no part of the real estate ; and the plaintiff, as an attaching creditor, stood upon precisely the same footing with his debtor. His lien embraced the interest of his debtor in the attached property, and nothing more.
Entertaining these views, we deem it unnecessary to go into an investigation of the law of fixtures. In so far as the plaintiff is concerned the concentrator was not a fixture, and his attachment of the real estate did not include it.
The question whether at the time of the levy the plaintiff had notice of the intervenor’s rights is of no importance. His own testimony seems to indicate that he had at least sufficient notice to put him upon inquiry, but the extent of the right which he acquired by his attachment is in no way affected by his notice or want of notice.
There is nothing in the objection that the intervenor had *350 not complied with the requirements of the statute concerning foreign corporations which calls for any extended consideration. The statute prescribes certain conditions upon which a foreign corporation may do business in this state, but this single transaction with The Emmons Mining Company was not doing business in this state within the meaning of the law; neither was the filing of the petition in intervention. Tabor v. The Gross Phillips Mfg. Co., 11 Colo. 419; Colorado Iron Works v. Sierra Gtrande Min. Co., 15 Colo. 499; Cooper Mfg. Co. v. Ferguson, 113 U. S. 727.
Taken as a whole, the findings of the court were erroneous, and the judgment based upon them must be reversed.

Reversed.