BANKS & BROS. v. RICE ET AL.

8  217
10  192
8  217
19  325

1. TRUST FUNDS—ASSIGNMENT FOR BENEFIT OF CREDITORS.

B. & B. consigned books to an agent under an agreement that they were to be sold for cash by the agent, who was to receive a commission and remit the balance as the books were sold. The books were sold, but the agent, instead of remitting the sum realized, mingled it with its own funds, used the mixed fund in carrying on its business and in the purchase of new goods, and afterwards made an assignment for the benefit of creditors. *Held*, that the money realized from the sale of the books was a trust fund, and B. & B. were entitled to payment of their claim out of the assets of the insolvent estate before distribution to general creditors.

2. SAME.

So long as a trust fund is employed in a business, it is immaterial what changes in the identity of the property representing it takes place. Through all the changes which may occur, the fund remains a charge upon the property.

*Error to the District Court of Arapahoe County.*

Messrs. RISING, BROWN & MALONE, for plaintiffs in error.

Messrs. BARTELS & BLOOD, for defendants in error.

THOMSON, J., delivered the opinion of the court.

This case comes here by writ of error from an order of the district court denying a petition of Banks & Bros. in the matter of the estate of The Stone & Locke Book and Stationery Company, praying an order of preference in favor of a claim held by them against the estate over claims of other creditors. The facts were agreed upon, and from them it appears that the petitioners were copartners engaged in the law book business in the city of New York, and that The Stone & Locke Book and Stationery Company was a corporation engaged in the book and stationery business in the city of Denver; that in 1892, the petitioners, having a contract with the state of Colorado for the publication of the

Colorado State Reports, entered into a contract with the
Stationery Company, whereby the petitioners were to keep
on sale with the Stationery Company the Reports of the Colo-
rado Supreme Court, and the Reports of the Colorado Court
of Appeals; that the company was to sell the books for cash,
receiving as its compensation a commission of 5 per cent of
the money realized from the sales, and remitting the balance,
as the books were sold, to the petitioners; that in pursuance
of this arrangement, and prior to November 4, 1893, the peti-
tioners had consigned to the Book and Stationery Company
604 volumes of the reports, upon which there was, in pur-
suance of the terms of the contract, due to the petitioners
from the Stationery Company the sum of $434; that on the
3d day of November, 1893, writs of attachment were levied
upon all of the goods, wares and merchandise of the company
by certain of its creditors; that on the 4th day of November,
1893, the company made a general assignment for the benefit
of all its creditors, and its property thereupon passed into the
possession of the assignee; and that before the filing of the
petition in this proceeding the petitioners demanded from
the assignee payment of the sum due them.   The agreed
statement contains the following paragraph:

" That the said Stone & Locke Book and Stationery Com-
pany failed to remit said sum of $434.32, and converted it
to their own use and mingled it with the funds of the com-
pany; that the said Stone & Locke Book and Stationery
Company used the funds with which the proceeds from the
sale of the books were mingled and mixed, in the conduct of
its business, in paying help, interest and expenses in the
management of its business, and in the purchase of new
goods and materials.   The new goods and materials so
purchased were placed in the stock of goods which the
said Stone & Locke Book and Stationery Company had
on hand for sale, and from the whole stock sold goods
as called for by their patrons and customers, and whenever
goods and materials were sold, the proceeds thereof were
used in the conduct of its business, in paying help, interest

and expenses connected with its said business, and in purchasing new goods and materials, which were placed in said stock; that at the time hereinafter mentioned, and the making of the assignment, there was in said stock a large amount of merchandise, which was invoiced for the sum of about twenty thousand dollars ($20,000), and are the same goods, wares and merchandise hereinafter mentioned as having been attached, and as having passed to the assignee by virtue of said assignment, and said stock included all goods which had been purchased by said Stone & Locke Book and Stationery Company, and which were then on hand."

We are called upon to determine whether, upon the foregoing facts, the petitioners are entitled to payment of their claim out of the assets of the insolvent estate in the hands of the assignee, before any distribution to other creditors, or whether the character of their claim is such that they are merely general creditors of the estate, entitled only to their *pro rata* share of what may remain after the claims of the attaching creditors are satisfied. It is entirely clear that the Book and Stationery Company, in selling books consigned to it, was merely the agent of the petitioners, and that the money realized from the sales, after its commission should be deducted, was their property, and became in its hands a trust fund. It is also evident that the mingling and confusion of that fund with its own moneys, thus destroying the identity of the fund, was the unauthorized and wrongful act of the company. These propositions are not controverted, and it is further conceded that if the trust fund can be traced into the property in the hands of the assignee, the petitioners are entitled to the relief prayed. But it is contended by counsel for the respondents that inasmuch as the fund was used in the payment of the debts and expenses of the company, it did not go into that property, and was therefore not represented by it. The agreed statement is that the general fund of the company, of which it had by its own unauthorized act made this particular one a part, was used not only in the payment of debts and expenses, but also in the pur-

chase of new goods and materials which were added to the
stock on hand; and that as sales were afterwards made from
the entire stock, the money realized was applied by the com-
pany to the payment of further debts and expenses, and to
the replenishment of its stock by the purchase of other new
goods; so that at least a portion of the trust fund must have
gone directly into the property of the company, and remained
there in some form until the assignment. This is a feature
of the case which the learned counsel for the respondents
seem to have entirely overlooked. Now, if a distinction can
be taken between the use of the fund in the payment of debts
and expenses necessitated by the company's business, and its
use in the purchase of new goods to be added to its stock, so
that it may be said that the stock of goods assigned repre-
sented nothing but the money which was actually used in
their purchase, then it devolved upon the respondents to
show how much of the fund in question was used to pay
debts and expenses, and how much went into the stock. It
was manifestly impossible for the petitioners to do this, and
inasmuch as the fund was wrongfully diverted, the burden
of separating the portion which went into the goods from
that which went elsewhere was upon the wrongdoers, or the
person or persons asserting their title. But in the absence
of any evidence on the subject, we are left to the legal pre-
sumptions which arise upon the facts as stated. If it be so
that the assets in the hands of the assignee cannot be charged
with any portion of the trust fund used by the assignor to
pay the debts and expenses of its business, then the pre-
sumption of law is that no part of the fund was so used. It
will be presumed that in drawing upon the consolidated fund
for that purpose, it drew upon its own money, and used its own
money, and that all the money of the petitioners was applied
in the purchase of goods, and is represented in the company's
assets. In other words, the presumption, in the absence of
evidence, is that the petitioners' money was applied where it
can be reached, and not where it cannot be reached. The
principle which we are endeavoring to embody in language is

indicated in the opinion in *Hall v. Otis*, 79 Me. 122, thus: " The question here is, what is the presumption when one makes a draft from a fund composed partly of his own money, and partly of money of another? We think the presumption is, the draft was intended to be made, and was made from the drawee's own fund." The respondents concede that the fund from which the debts and expenses were paid belonged partly to the company; and, in so far as it may be necessary for the protection of the petitioners' interest in the fund, the presumption is that the payments came from its own share, and that therefore the whole of the money of the petitioners went into the stock.

It is unnecessary for any purpose of this decision to dis- cuss the proposition of counsel, that where an agent or trustee has wrongfully used or appropriated the money of another in the payment of the debts or expenses of his business, the money cannot be followed into his estate, because there is nothing in the admitted facts showing that in this instance such was the case, and the presumption is to the contrary; and also because the record does not advise us when these debts and expenses were incurred. It occurs to us, however, that the necessary expense of carrying on a business is as much represented in the property belonging to the business as money used in the purchase of the property. A merchant must, in fixing the selling price of his goods, if he expects to be able to continue in business, take into consideration the expenses of his business as well as the cost of his goods, in order that when his stock is sold both expense and cost may be returned to him. The money received for each article sold would represent that article's share of the entire cost of the stock, and also of the entire expense of the business, together, presumably, with a profit superadded; and the value of the whole stock would be the sum total of expense, cost and profit. These several elements would be included in the selling price of the goods, and the property would directly represent each and all of them. We are therefore inclined to the opinion that it would be immaterial whether

the money of the petitioners was used in the purchase of goods, or in the payment of the expenses of the business, provided the expenses were incurred after the money was received. It seems to us that in either case the property would represent the fund, and the fund would be a preferred charge upon it. But, the evidence respecting this matter of debt and expense being deficient, the case is controlled by the presumption of which we have spoken.

The fact that there was a continual change taking place in the stock, by the sale of the goods and the replacing of them with others, does not, in our opinion, complicate the situation. From the time of the first misuse made by the company of the trust fund to the date of tne assignment, the stock may have been several times changed by sales and purchases, yet this fund remained in the business to the last. It was represented to its full amount in the property assigned, and is now present in the assets in the hands of the assignee. So long as the fund was employed in the business, it is immaterial what changes in the identity of the property representing it took place. Through all the changes which occurred, the fund was, and still remains, a charge upon the property. *Frelinghuysen v. Nugent*, 36 Fed. Rep. 229; *Bank v. Weems*, 69 Tex. 489; *Cavin v. Gleason*, 105 N. Y. 256.

The liens which the attaching creditors acquired by their attachments are without effect as against the claim of the petitioners. They could operate only on the title which the Book and Stationery Company had when the writs were levied, and the estate must be subjected to the payment of the amount due the petitioners before anything can be realized upon the attachments. *Gates Iron Works v. Cohen*, 7 Colo. App. 341.

Upon the agreed facts the petitioners were entitled to an order directing the assignee to pay them the amount of their claim out of the proceeds of the estate prior to any payments to the attaching creditors, and the judgment will be reversed with instruction to the district court to enter an order in conformity with this opinion.

*Reversed.*