In the Matter of Arnold R. RHINE, also known as A. R. Rhine, formerly engaged in business, as Rhine Petroleum Industries, Majestic Petroleum Company, Petroleum Industries of Utah, Bankrupt.

No. 24691.

United States District Court
D. Colorado.

April 28, 1965.

Rehearing Denied June 21, 1965.

See 242 F.Supp. 127.

See also D.C., 213 F.Supp. 527.

William E. Foster, Grand Junction, Colo., for Louis J. Cenni and Ruby June Cenni and others, petitioners on review.

Thomas M. Sullivan, Denver, Colo., for Maynard Aaby, petitioner on review.

Jerome R. Strickland, Denver, Colo., for R. V. Rosellini and Gladys E. Rosellini, petitioners on review.

Russell P. Kramer, Denver, Colo., for Grant Oxley and Opha G. Oxley and others, petitioners on review.

Norma L. Comstock and Norman H. Comstock, Denver, Colo., for John W. Shireman, trustee in bankruptcy.

DOYLE, District Judge.

Before the Court are a number of petitions to review the findings of the Referee in Bankruptcy in the above case. These matters have been argued extensively and comprehensive briefs have been submitted. The matter is now before the Court for determination. All of these problems have to do with the rights of investors in the enterprise of Arnold R. Rhine, a bankrupt, who filed a petition in voluntary bankruptcy on December 1, 1959. Prior to that date he had sold working interests in oil wells located in Oklahoma to about one thousand investors. Over three million dollars of these sales occurred during 1959. Originally there were 541 reclamation petitions seeking rescission based on common law fraud violation of the State Securities Act or violation of the Federal Securities Act. Most of these were filed after the bankruptcy proceedings were initiated. Some 470 of these petitions are now before the Court.

Basically, there are four different groups which are referred to as the "Oxley," "Aaby," "Rosellini," and "Cenni" groups. The Oxley and Aaby petitioners maintain that the referee erred in upholding the rights of the trustee under Section 70, sub. c of the Bankruptcy Act as against their right to rescind because of common law fraud. The Cenni and Rosellini groups seek to reverse the order of the referee holding that their proportionate share of any amounts later found to be owing to wage, trade or lien claimants arising from the operation of any lease in which they had an interest, be charged against any sum allowed to them by way of reclamation or general claim. The petitioners Rosellini and Cenni also seek to reverse the decisions of the referee based on the rules of tracing adopted by him. The petitioner Aaby seeks

to reverse the order of the referee deciding that the filing of a claim prior to the filing of petition in reclamation constitutes an election to become a general creditor and a waiver of any right that the petitioner may have had to rescind and reclaim. The petitioner Cenni is also concerned with the effect to be given to a State court judgment in its favor.

It was assumed for the purpose of all the hearings held before the referee that facts existed that would entitle each reclamation petitioner to rescind his purchase of interests in oil and gas leases from the bankrupt on the grounds of either common law fraud, violation of the Federal Securities Act, or violation of the State Securities Act. The Cenni and Rosellini petitions were tried on stipulation between counsel and the trustee that the moneys paid by these petitioners to the bankrupt were the result of fraudulent representations on the part of the bankrupt.

The trustee presently has on hand some $500,000.00 representing the sale of property, collections of other assets and bank accounts turned over to him at the inception of the bankruptcy proceedings. Included is the sum of $218,-000.00 which was in the Jefferson County Bank, and much of the controversy has to do with the rights of any of the petitioners to this sum of money, all of which was deposited prior to the inception of the bankruptcy proceedings.

The questions which have been certified by the referee may be summarized as follows:

*First,* whether the trustee's rights and powers under Section 70, sub. c of the Bankruptcy Act prevent rescission by all reclamation petitioners;

*Second,* if rescission is a remedy available to any reclamation petitioner, what rule of tracing must the Court apply in determining rights of petitioners to funds of the bankrupt in the mentioned bank accounts?

*Third,* if any petitioners who could trace their money into the bank accounts were at one time in a position to rescind

their purchase from Rhine, are they nevertheless barred from rescinding either by an election of remedies or laches?

*Fourth,* if any petitioner can rescind and prevail on a reclamation petition should he pay his pro rata share of wage and trade debts and of preservation costs and administration expenses?

*Fifth,* what is the legal effect to be given to the State court judgment which was obtained by petitioner Cenni, and what rights, if any, did petitioner Oxley acquire by intervening in proceedings relating to that judgment?

These questions will be taken up in the order that they are mentioned above.

### I.

On the matter of the effect of Section 70, sub. c of the Bankruptcy Act, the referee found as follows:

"That the defense asserted by the trustee under Section 70c of the Bankruptcy Act as to all of the petitions, in reclamation, except those numbered 3, 84, and 86, is valid; that upon adjudication of the bankrupt on December 1, 1959, the trustee, by virtue of the provisions of said Section 70c, became vested, as of such date, with all the rights, remedies, and powers of a creditor then holding a lien on all bank accounts, funds, and assets of the bankrupt, and attained rights superior to those of petitioners; that by virtue thereof, none of the reclamation petitioners, except those whose petitions are numbered 3, 84, and 86, is entitled to reclaim any of such assets from the trustee or the bankruptcy estate.

" * * * it is therefore, ORDERED, ADJUDGED, and DECREED:

"That none of the petitioners whose petitions are numbered 1; 2; 4–15; 17; 18; 22–34; 36–37; 55–59; 66–70; 78–80; 82; 87–149; 151–211; 213–255; 258–280; 282–307; 309–320; 322–343; 346–358; 360–381; 383–420; 422–484; and

486–521; is entitled to reclaim any of the bank accounts, funds, or other assets of the bankrupt or the bankruptcy estate, by virtue of the provisions of Section 70c of the Bankruptcy Act, by which the trustee, as of the date of bankruptcy, became vested with all rights, remedies and powers of a creditor then holding a lien on all such assets, and attained rights superior to those of petitioners, and all such petitions be and they are hereby dismissed."

The referee thus held that the trustee, by reason of the rights granted to him under Section 70, sub. c of the Bankruptcy Act, is entitled to prevail as against those creditors who were the victims of the bankrupt's fraud who did not rescind prior to the date of bankruptcy.

Section 70, sub. c of the Bankruptcy Act (Title 11 U.S.C. § 110, sub. c), provides:

"* * * The trustee, as to all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt could have obtained a lien by legal or equitable proceedings at the date of bankruptcy, shall be deemed vested as of such date with all the rights, remedies, and powers of a creditor then holding a lien thereon by such proceedings, whether or not such a creditor actually exists."

In essence, the trustee's argument is that he stands in the position of an ideal creditor with a lien obtained by legal or equitable proceedings at the date of bankruptcy and that unless defrauded creditors have rescinded prior to date of bankruptcy they are precluded from doing so. This was the ruling of the referee. But to further support the referee's ruling the trustee maintains that he is entitled to the standing indicated because of the fact that there are actual wage and trade creditors capable of individually prevailing over the defrauded investors.

The statute in question, Section 70, sub. c, first appeared in the Bankruptcy Act in the year 1910. It has been amended in 1938, 1950 and 1952. However, none of these amendments affect the question here presented, that is, the legal status of the trustee in relationship to property coming into possession of the Bankruptcy Court. Thus, cases decided under the 1910 Act are authority with respect to the present question. See 4 Collier on Bankruptcy, (14th ed.) ¶ 70.47[2], [3] and [4].

█ It has long been recognized that Section 70, sub. c does not automatically give to the trustee rights superior to persons who have been defrauded by the bankrupt and are seeking to rescind. The trustee's rights are superior or not, depending on whether, according to the law within the district, the rights of a lien creditor obtained by legal or equitable proceedings are or are not superior to those of a defrauded rescinding creditor. See J. S. Appel Suit & Cloak Co., 198 F. 322 (D.C.Colo.1912); In re Gold, 210 F. 410 (7 Cir., 1913); Jones v. H. M. Hobbie Grocery Co., 246 F. 431 (5 Cir., 1917); In re Spinks Drug Co., 298 F. 307 (N.D.Ga., 1924); In re Perelstine, 19 F.2d 408 (W.D.Pa.1927); 4 Collier on Bankruptcy (14th ed.) ¶ 70.41 at page 1319, n. 7.

Indeed, numerous decisions have recognized the right of a defrauded creditor to rescind and to trace his property in a bankrupt estate. Fisher v. Shreve Crump & Low Co., 7 F.2d 159 (D.C.Mass. 1925); Manly v. Ohio Shoe Co., 25 F.2d 384 (4 Cir., 1928), 59 A.L.R. 413; In re Indiana Concrete Pipe Co., 33 F.2d 594 (N.D.Ind.1929); Hough v. Atchison, T. & S. F. Ry. Co., 34 F.2d 238 (10 Cir., 1929); In re Kravitz, 278 F.2d 820 (3 Cir., 1960); In re Thompson, 4 F.Supp. 921 (W.D.Wash.1933); In re A. C. Kelly & Co., 6 F.Supp. 221 (S.D.N.Y.1933); In re Stridacchio, 107 F.Supp. 486 (D.C. N.J.1952); In re Monson, 127 F.Supp. 625 (W.D.Ky.1955); In re Bentzel, 161 F.Supp. 219 (D.C.Md.1958).

Thus, in Manly, supra, the Court said:

"* * * Where goods are obtained by fraud of the bankrupt, the seller may rescind the contract of sale and

reclaim them if he can identify them in the hands of the trustee. This is on the theory that fraud renders all contracts voidable, and that neither in law nor in morals would the trustee be justified in holding goods obtained by the fraud of the bankrupt for the benefit of other creditors. Such creditors have no right to profit by the fraud of the bankrupt to the wrong and injury of the party who has been deceived and defrauded." 25 F.2d at 385.

Thus, there is not any merit to the trustee's position that he is *ipso facto* vested with rights which are superior to those of creditors who fail to rescind before bankruptcy; rather, the trustee's rights depend on the Colorado law as to whether a lien creditor prevails against a rescinding purchaser.

■ The law in Colorado would appear to be that a rescinding defrauded claimant prevails against a creditor with a lien obtained by legal or equitable proceedings *in the absence of estoppel.* Banks v. Rice, 8 Colo.App. 217, 45 P. 515 (1896); Gates Iron Works v. Cohen, 7 Colo.App. 341, 43 P. 667 (1896); Leschen & Sons Rope Co. v. Craig, 18 Colo. App. 353, 71 P. 885 (1903); Collins v. Thuringer, 92 Colo. 433, 21 P.2d 709 (1933); Denver Joint Stock Land Bank of Denver v. Moore, 93 Colo. 151, 25 P.2d 180 (1933); Susman v. Exchange National Bank of Colorado Springs, 117 Colo. 12, 183 P.2d 571 (1947). See also IV Scott, The Law of Trusts (2nd ed.) § 468; Restatement of Restitution, § 166.

The language of the Colorado Supreme Court in Susman, supra, clearly recognizes the right of the defrauded owner to prevail in the absence of estoppel.

■■ The next question is whether the trustee is invariably armed with an estoppel in a situation like the present, that is, where the rescission is not exercised prior to the trustee's appointment. If the trustee is right with respect to this there could seldom, if ever, be a reclamation. However, the trustee maintains that he is armed with an estoppel whenever actual creditors of the bankrupt exist who could assert an estoppel as against the reclamation petitioner. It should be noted that estoppel, as here used, means a creditor whose rights have intervened and who is capable of cutting off the investor's equity because he has been misled to extend credit and that this is due to the conduct of the rescinding, reclaiming creditor in permitting the bankrupt to act and to appear to be worthy of the credit extended. See Susman, supra, and Lewin v. Telluride Iron Works Co., 272 F. 590 (8 Cir., 1921). It may well be that there are creditors whose equities would outweigh those of the present petitioners in a contest between the two parties. It does not follow from this, however, that the trustee is entitled to automatically stand in their positions or to assert estoppels derived from them. To so hold would be harsh and inequitable to the reclaiming creditors and would not be fair to the intervening creditors who are capable of asserting estoppel in that they would have to share with general creditors who do not stand in this position. The Colorado cases cited above do not recognize any such derivative estoppel as that here asserted by the trustee. These cases contemplate an estoppel which can be specifically proven. Therefore, the indications to be gleaned from the Colorado cases are contrary to the referee's ruling.

The proper approach to the question here in issue is set forth in 4 Collier on Bankruptcy (14th ed.) ¶ 70.41, as follows:

"The law of contracts in most states permits rescission by a party who was induced to enter into a contract by a fraudulent or innocent representation. Where property has been transferred, the defrauded party is entitled to its restoration, if no innocent party has acquired an interest in it. The intervention of bankruptcy between bargain and rescission has not been allowed to interfere with the right to rescind

and reclaim; the trustee in bankruptcy takes title to the bankrupt's property subject to the retroactive divestment effected by such a rescission. * * * Generally speaking, once fraud is established, bankruptcy is no bar to a return of property which passed under the fraudulent agreement. Most of the issues in bankruptcy cases involving the right to rescission are variations on a single theme: does the act complained of give rise to a right to rescission under the local law? * * * The only problem peculiar to bankruptcy that may be raised is whether under § 70c, which gives the trustee the rights of a creditor holding a lien by legal or equitable proceedings at the date of the filing of the petition, the trustee has rights superior to the rescinding party. The answer has almost uniformly been in the negative, except in cases where the bankrupt was a trader and the jurisdiction in question had a 'traders act' or 'sign statute' that was not complied with by the bankrupt purchaser. * * * "

■ We conclude, therefore, that it was error for the referee to find that the trustee's position under § 70, sub. c is superior to that of reclamation petitioners who asserted their rights after bankruptcy and we must also reject the contention of the trustee, here argued, that he can assert a derivative estoppel on behalf of all creditors if any creditor would be in a position to do so. Estoppel, if available, must be asserted by the individuals who themselves are in a position to raise it.

### II.

■ The petitioners are required not only to establish their right to rescind, but after this they must prove that their property is in the hands of the trustee. Whether they have a right to participate depends largely upon the tracing rule which is held to be applicable. On this the trustee held that the so-called "first in, first out" rule was applicable. His ruling is in pertinent part as follows:

"No presumption may be indulged in this case that the maintenance by the bankrupt of a cash balance equal to or greater than the amount of the payment of any single reclamation petitioner, between the date of payment and the taking by the bankruptcy trustee of the balance, is sufficient to allow the establishment of a trust or equitable lien upon the account. In this case where there are many asserted trusts and many petitioners in the same situation, the presumption could only be indulged if the cash kept on hand equalled or exceeded all the trust claims. * * *

"The rule of tracing applicable to this bankruptcy case is that deposits into the various bank accounts of the bankrupt are presumed to have been drawn out in the order they were deposited, and any allowable reclamation from the remaining balances must be given in inverse order of their deposit in each of such accounts. * * *"

*    *    *    *    *    *

"That pursuant to the rules of tracing established by the court on April 17, 1964 * * * no portion of the petitioners' claim for—other than said—has been traced into the possession of the trustee. * *"

■ The first inquiry is whether the Supreme Court of Colorado has adopted this first in, first out, or the rule in "Clayton's Case", as it is often called. We find that the Colorado Court has not formally adopted any such rule. There are several cases which discuss the problem. See Holbrook Irrigation District v. First State Bank, 84 Colo. 157, 268 P. 523; Banks v. Rice, 8 Colo. App. 217, 45 P. 515; First National Bank v. Hummell, 14 Colo. 259, 23 P. 986, 8 L.R.A. 788; Cotting v. Berry, 50 Colo. 217, 114 P. 641. The most that these cases hold is that the claimant has the burden of proving that his funds

went into the hands, bank account, or control of the alleged constructive trustee. The language contained in some of these opinions could be cited to support one rule or the other, but they indicate more strongly a preference for a rule of tracing other than that adopted by the referee. Thus, for example, it has been held that there exists a presumption that the defaulting trustee drew out his own money first and that the trust funds remained. See Banks v. Rice, supra. Inasmuch as the Colorado Court has not committed itself to the rule in Clayton's Case, this Court is not bound to apply this doctrine.

▇▇▇ Professor Scott, in his Treatise on Trusts, IV Scott, The Law of Trusts, (2nd Ed.), Section 518, declares that where a wrongdoer has mingled money with his own and later made withdrawals and has added money of his own to the fund, the claimant is entitled to an equitable lien upon the fund. He further states that where, in spite of the withdrawals, the amount in the fund has never diminished below the amount of the claimant's money which went into it, the claimant is entitled to a lien upon the fund for the whole amount of his contribution. But if at any time the balance falls below the amount of the claimant's money which went into the fund, he is entitled to a lien only to the extent of the lowest balance existing at any time after the time of the mingling. In Section 519 of the same treatise the author adds:

> "Where the money of several claimants is mingled, and subsequently withdrawals are made by the wrongdoer from the mingled fund, there is a conflict of authority on the question of the rights of the several claimants. It seems clear on principle that they should be entitled to share pro rata both in the money withdrawn or its product and in that remaining. If the amount withdrawn is dissipated or cannot be traced, the claimants should share the balance remaining in proportion to their contributions. It has been so held in a number of cases.

> "In several cases, however, a different result has been reached where the wrongdoer deposited money of several claimants in a single account in a bank and subsequently made withdrawals from the account and dissipated the money withdrawn. In these cases it was held that as between the claimants the rule in Clayton's Case is applicable, and that the withdrawals are to be considered as having been made in the same order in which the deposits were made. According to these decisions, if a person wrongfully takes $1000 of A's money and deposits it in a bank account and subsequently deposits $1000 of B's money, and later withdraws $500, A is entitled to $500 of the balance and B is entitled to $1000; and if $1000 was withdrawn, B is entitled to $1000 remaining and A is entitled to nothing. This result is so clearly arbitrary and unfair that one must suspect the soundness of the reasons upon which it is based; and, indeed, the only basis turns out to be the application of presumptions based on fictions. Judge Learned Hand recognized this, although he felt bound by authority to apply the rule in Clayton's Case."

The reference is to Judge Learned Hand's opinion in the case of In re Walter J. Schmidt & Co., 298 F. 314 (S.D. N.Y.1923), wherein it is said:

> " * * * It depends upon charging withdrawals from a fund held by two joint cestuis que trustent against the earlier of the two, following or assuming to follow the rule in Clayton's Case, 1 Mer. 572. However, as pointed out by Professor Scott in 27 Harv.Law Rev. 130, note 15, the circumstances are wholly different. The rule in Clayton's Case is to allocate the payments upon an account. Some rule had to be adopted, and though any presumption of intent was a fiction, priority

in time was the most natural basis of allocation. It has no relevancy whatever to a case like this. Here two people are jointly interested in a fund held for them by a common trustee. There is no reason in law or justice why his depredations upon the fund should not be borne equally between them. To throw all the loss upon one, through the mere chance of his being earlier in time, is irrational and arbitrary, and is equally a fiction as the rule in Clayton's Case, supra. When the law adopts a fiction, it is, or at least it should be, for some purpose of justice. To adopt it here is to apportion a common misfortune through a test which has no relation whatever to the justice of the case.

"It does not follow, however, that the claimants should divide the fund in the proportions of their original deposits. An illustration will perhaps be clearest. Suppose three claimants, A., B., and C., for $5,000 each, whose money was deposited at intervals of a month, January, February, and March. Suppose that the fund had been reduced on some day in January to $3,000. A. has lost $2,000, which he cannot throw on B. Hence, when B.'s money is deposited on February 1st, A. and B. will share $8,000 in the proportion of 3 to 5. Suppose that during February the account gets as low as $4,000. A. and B. cannot throw this loss on C., and when C.'s money is deposited they will share the $9,000 in the proportion of 3, 5, and 10. But any subsequent depletion below $9,000 they must bear in that proportion, just as A. and B. bore theirs in February. At least, to me it would be a parody of justice if, out of a remainder, for example, of $7,000, C. should get $5,000, B. $2,000, and A. get nothing at all. Such a result, I submit with the utmost respect, can only come from a mechanical adherence to a rule which has no intelligible relation to the situation."

The Judge Hand analysis which provides that withdrawals shall be charged, first against the trustee's interest, and then to the several trusts in proportion to their several interests at the time of the withdrawal, is far more equitable than the rule in Clayton's Case, which is merely a rule of administrative convenience based upon presumptions and fictions. Not only is the Judge Hand rule more equitable, it is supported by well established principles. See 102 A.L.R. 372, supplementing annotations at 26 A.L.R. 3, 35 A.L.R. 747, and 55 A.L.R. 1275. To be sure, the rule in Clayton's Case is much less complex to administer and apply, but at the same time it is arbitrary and inequitable.

In the case at bar, at the date of bankruptcy the Jefferson County Bank account was in the amount of $218,840.96 and the Denver-U. S. account was in the amount of $897.56. The lowest level of the Jefferson County account was $91,918.29. The trustee maintains that since the bank accounts were depleted below the *total* amount of the trust funds, no part of that remaining in the accounts could be reclaimed by any petitioner, not even the lowest balance; and secondly, that even if the lowest balance were held to be subject to reclamation, the rule in Clayton's Case would apply. This position is unfounded.

It must be conceded that the claimants would have and will have a difficult burden of proof in establishing that their funds went into the account and, secondly, in showing their pro rata entitlement considering the ups and downs of the account during the period in question. However, this difficulty is not insurmountable. The variables are the amounts and dates of deposits of trust funds, and determination of the extent, if any, of depletion of previously deposited trust funds at the time that a new deposit is made. It is, of course, clear that once trust funds have been depleted

they are not restored by subsequent deposits.

It may be that computation of the proportion of loss attributable to each petitioner will call for the services of an accountant. If so, such service should be obtained. However, these practical problems do not justify the adoption of the arbitrary first in, first out rule. It must be concluded that the referee erred in finding the first in, first out rule to be applicable.

### III.

The Aaby group of petitioners all filed unsecured claims long prior to the filing of reclamation petitions. Because of this the trustee pleaded that the petitioners had elected to become general creditors by virtue of these filings. Subsequently, the trustee submitted to the referee the information as to the claims filed. Various types of claims were filed by each of the claimants and upon the record thus submitted the referee ruled that the filing of any general claim in bankruptcy, whether designated as secured, unsecured, priority or preference, prior to the date of the filing of a petition in reclamation constituted an election to become a creditor thus barring petitions in reclamation.

The essential part of the referee's ruling is:

"That the filing in this bankruptcy proceeding of any general claim in bankruptcy whether designated by the claimant or claimants as secured, unsecured, priority or preference, at any time prior to the date of the filing by such claimant or claimants of any petition in reclamation, or petition to impose a trust and reclaim, constitutes an election to become a creditor of the bankruptcy estate, and the petitions filed by all such claimants must be dismissed.

" * * * it is therefore ORDERED, ADJUDGED, and DECREED:

"That each and every petitioner who filed any general claim in bankruptcy, at any time prior to the date of the filing by such claimant or claimants of any petition in reclamation, or petition to impose a trust and reclaim, elected to become a creditor of the bankruptcy estate, and all such petitions be and they are hereby dismissed. * * * "

Aaby contends that he has not elected to proceed as a general creditor because: first, he did not have knowledge of the existence of the two remedies inasmuch as he did not know of the bankrupt's fraud at the time that he filed his general claim; secondly, he maintains that the filing of a general claim does not in and of itself constitute an election unless the remedy is pursued to conclusion; and thirdly, that an election of remedy is not binding unless there is a change in position by the opposing party.

The rule appears to be that "the power of avoidance for fraud or misrepresentation is lost if the injured party, after acquiring knowledge of the fraud or misrepresentation manifests to the other party to the transaction an intention to affirm it. * * * " Restatement of Contracts, § 484.

The question here is whether the filing of a general claim constitutes a manifestation, assuming the presence of knowledge, and this itself is in dispute. The referee's ruling makes no distinction between the election with knowledge and that without knowledge. There are cases which hold that the commencement of an action or, in some instances, its prosecution short of judgment, constitutes an election. See 6 A.L.R.2d 10. There are, however, cases to the contrary. A distinction is recognized by Collier where there are different proceedings as against a situation where both remedies are asserted in one proceeding. See 3 Collier on Bankruptcy, 14th ed., ¶ 63.25[2.1]. The author states:

" * * * The former problem presents itself when a claimant files in the bankruptcy proceeding both a petition in reclamation for property sold and a proof of claim for the purchase price. In such a case, the

'inconsistency,' if any, is only superficial, for in reality one type of relief is sought for one *res* and a different remedy for another *res*, though both are supported by the same transaction. If a wholesaler, induced by the purchaser's false representations, sells 200 pairs of shoes, 50 of which are disposed of by the purchaser prior to the latter's bankruptcy, while the balance comes into the possession of the trustee, there is no inconsistency in attempting to recover the goods that are in the trustee's hands while a proof of claim is filed for money had and received with regard to the goods resold by the debtor. And even where this method of disposing of an apparent inconsistency does not avail, because the property sold is indivisible, there is ample authority discrediting the doctrine of election as harsh and largely obsolete, an attitude that is particularly justified after the reform wrought by the Federal Rules of Civil Procedure, allowing a claimant to ask for remedies in themselves inconsistent."

Thus, it would appear that Collier's view is that the filing of a general claim in bankruptcy does not operate to bar other remedies in the same bankruptcy proceedings.

Some of the cases have criticized this doctrine of election as applied to proceedings such as the present. See Friederichsen v. Renard, 247 U.S. 207, 38 S.Ct. 450, 62 L.Ed. 1075, and the Matter of Rose, D.C., 39 F.2d 242. In the latter case the Court said: "The doctrine of election so harshly though poetically invoked by Portia does not apply to a reclamation claim in a bankruptcy proceeding." In Friederichsen, the Supreme Court said: "At best this doctrine of election of remedies is a harsh, and now largely obsolete rule, the scope of which should not be extended."

There are a good many Colorado cases dealing with election of remedies and from these it is not possible to deduce the existence of a rule which holds that the filing of a claim constitutes an irrevocable election to pursue this remedy to the exclusion of another in a bankruptcy proceeding; indeed, there are many Colorado cases which indicate that an election may be exercised after filing although not after trial. See Gibraltar Insurance Co. v. Brink, 113 Colo. 304, 157 P.2d 134.

It is concluded that although there are cases from which it can be argued that the filing of a claim constitutes an election to pursue that remedy, it does not appear, however, that such a filing generally constitutes an irrevocable election.

The fact that the doctrine of election is distasteful and arbitrary is not alone reason for refusing to apply it. Furthermore, it does not have to be decided on any such basis. Here there has not been any waiver or renunciation of a basic right. Nor has the trustee been misled. Indeed, the two remedies do not appear to be incompatible.

An additional and more specific ground in the case of Aaby is that the very terms of his claim as it appears in the record before this Court shows that he gave notice of intent to rescind in the claim itself and demanded the amount of his investment upon the basis of the rescission which he asserted. Thus, he neither renounced nor waived.

It must be concluded, therefore, that the filing of the claim did not constitute an election of remedies and that it was error to so hold.

## IV.

All of the reclamation petitioners have taken exception to the referee's ruling which would charge any reclaimed property with wage, trade and lien claims arising from the operation of any lease in which the reclamation petitioner had an interest. They also complain about the order which would assess costs against the property which they succeed in reclaiming. A summary of the referee's order reads as follows:

"* * * it is therefore ORDERED, ADJUDGED and DE-

CREED * * * That their proportionate share of any amounts subsequently found to be owing to any wage, trade, or lien claimant of the bankrupt arising from the operation of any lease in which such reclamation petitioners had an interest under any Assignments of Interest in Oil and Gas Leases involved in their petition for reclamation, be subsequently determined at a time to be fixed by the court, and charged against any sums which may become payable pursuant to the provisions hereof.

*     *     *     *     *     *

"As to each petitioner who is successful in establishing his right to reclaim, the proportionate amount of the costs of preservation of the property, costs of administration and operating expenses, shall be assessed against his equitable share before it is disbursed. * * * "

It should be noted that a review of these orders by this Court now is somewhat premature since future hearings and specific determinations are contemplated. To comment briefly upon these rulings may, nevertheless, avoid a subsequent review proceeding.

It is true that the referee may impose conditions in connection with the granting of a reclamation petition. See 4 Collier on Bankruptcy, 14th ed., ¶ 70.39, p. 1305, wherein the author states:

"It should be remembered that the bankruptcy court is a court of equity. Hence, when a petition for reclamation is passed upon, the court may impose various conditions that must be satisfied before a restoration of the property will be ordered."

The author's note to the above (f.n. 15) collects the cases which have to do with this subject. These would appear to be valid guides at least for making this determination. From a reading of this note it must be concluded that the referee does not have any unlimited power to impose such conditions. Some conditions are appropriate so long as they are dictated by principles of equity. The mere operation of a lease in which a petitioner had an interest seems to be an insufficient basis for charging his interest. More specific findings are indicated. It may well be that the referee would be justified in concluding that there is a basis for an estoppel in specific instances; or, it may be that the relationship between Rhine and the petitioners was that of agent and principal; or, there may be other equitable considerations which would justify the imposition of conditions. However, these are not set forth in the referee's order and so it must be concluded that insofar as the order seeks to impose conditions based merely upon the investment of petitioners and the carrying on of a going concern by Rhine, it is erroneous. In summary, then, the application of the equitable guides laid down by the cases in note 15, supra, must be against a background of factual determinations.

Turning now to the second matter, that of the assessment of expenses of administration: We again note that the matter is not entirely ripe; in other words, no actual assessments have been made. The referee has concluded that the reclamation petitioners must bear their proportionate costs of preservation of the property, operating expenses and administration. Here again considerations of equity would govern. See 4 Collier on Bankruptcy, 14th ed., ¶ 70.99[6] and see also 3 Collier on Bankruptcy, ¶ 64.105[1.4]. The author indicates that costs of administration beneficial to reclamation petitioners can be paid out of the reclaimed funds and, no doubt, other equitable factors could enter into this determination. Once again, however, the basis in fact and law for the assessment of such costs should be clearly enunciated. Subject to the above suggestions, it is concluded that the findings in question be affirmed.

## V.

The final question is concerned with the propriety of the referee's ruling refusing to recognize the judgment of the District Court of Mesa County, Colorado, which judgment was rendered on November 30, 1959, a day before the bankruptcy petition was filed. That action sought to declare Rhine a constructive trustee of the funds invested. It was accompanied by a writ of attachment and garnishment. On December 4, 1959, the referee entered an order releasing the garnishment. Thereafter, a petition was filed to vacate this order; then, on March 1, 1960, the referee ordered that the trustee segregate funds sufficient to cover the amount originally tied up. The petitioner Oxley intervened on May 12, 1960, in the proceeding concerning the order vacating the garnishment. The Mesa County action proceeded to judgment and after that the trustee and Cenni entered into a compromise agreement which was approved by the referee. The ruling complained of is summarized as follows:

"That on or about December 16, 1960, the trustee filed herein his petition to compromise his controversies with petitioners Cenni, et al., and on December 23, 1960, an order was entered herein approving such compromise by the payment to them of $15,000.00 * * * ; such order also contained a provision to the effect that Cenni, et al., be relegated in this proceeding to their claims under their reclamation petition and proofs of claim. * * *

" * * * it is therefore ORDERED, ADJUDGED, and DECREED * * * That neither the motions to intervene or the request for separate hearing, filed herein by petitioners [Oxley, et al.] entitled the said petitioners to any trial or hearing separate from those [of other petitioners], and their application therefore is denied."

It is apparent from the above that the referee merely construed the compromise agreement and concluded that it was intended to relegate Cenni to his position as a reclamation petitioner. Thus, there is no question raised as to the State court's jurisdiction to proceed to judgment. See In re Hoey, Tilden & Co., 292 F. 269 (S.D.N.Y.1922), wherein it was held that a suit to establish a constructive trust in State court is not superseded by bankruptcy proceedings. See also Nicklaus v. Bank of Russellville, 336 F.2d 144 (8 Cir., 1964). Here the question is not one of the binding character of the State court judgment or a question of that court's jurisdiction. The referee's conclusion is based upon his finding that Cenni waived his rights arising under the judgment by entering into the compromise agreement of December 23, 1960. The pertinent language of that agreement reads:

"Cenni shall be relegated to their claims under the reclamation petition and proofs of claim, subject to whatever offsets or counterclaims or other defenses are available to the trustee under the answers filed by him, as the court may later determine; that if they succeed in tracing any of their items of payment as hereinabove defined into the hands of the trustee, or establish a lien thereon in any amount, the item so traced, or the amount of lien so established shall be reduced proportionately. * * * "

It is manifest from a reading of this agreement that its effect is to vacate the garnishment proceedings. We must hold that the further question whether it also had the effect of waiving Cenni's rights in the State court judgment was and is a question of fact and the findings of the referee in this regard are not to be set aside unless clearly erronous. 1 Collier on Bankruptcy, 14th ed., ¶ 1.19[5].

The evidence is sufficient to support the finding.

Furthermore, it is questionable whether the State court judgment could be conclusive on the question of tracing since the trustee was not a party to that action and did not have an opportunity to be heard. Be that as it may, the referee's ruling was correct.

█ Oxley's grievance is even more remote. Had he succeeded, the result would have been reinstatement of the garnishment in favor of Cenni. Oxley had no interest in this; therefore, it was not error to refuse to hear Oxley with respect to the order vacating the writ of garnishment. In summary, it is

Ordered that:

It was error to find that Section 70, sub. c of the Bankruptcy Act gave the trustee rights superior to those of the interested petitioners. [Part I of this Opinion]

It was error to find that the rule in Clayton's Case applied to the tracing of funds of the several reclamation petitioners. [Part II of this Opinion]

It was error to find that petitioner Aaby elected to proceed as a general creditor and this finding must also be reversed. [Part III of this Opinion]

In general, the ruling that the referee is empowered to impose conditions on property reclaimed having to do with wage, trade or lien claims, and proportionate costs of preservation, administration and operating, is affirmed. [Part IV of this Opinion]

It is further ordered that the findings that Cenni waived his rights under the judgment of the District Court for Mesa County and that petitioners Oxley, et al., could not be heard regarding the order vacating the garnishment of certain funds were proper and these findings are affirmed. [Part V of this Opinion]

The case is remanded to the Bankruptcy Court for further proceedings.