In re COMMERCIAL FINANCIAL SERVICES, INC., and CF/SPC NGU, Inc., Debtors.

NationsBank, N.A., Plaintiff,

v.

Commercial Financial Services, Inc., Defendant,

and

The Official Committee of Unsecured Creditors, and the Official Committee of Asset–Backed Securityholders, Intervenors.

Bankruptcy Nos. 98–05162–R, 98–05166–R.

Adversary No. 98–0356–R.

United States Bankruptcy Court, N.D. Oklahoma.

Oct. 15, 2001.

Larry Wolfson, Jerry L. Switzer, Jr., Jenner & Block, LLC, Chicago, IL, Jay S. Geller, Law Office of Jay S. Geller, Portland, ME, Neal Tomlins, Tomlins & Goins, Tulsa, OK, for debtor/defendant.

Joe Edwards, Day, Edwards, Propester & Christensen, P.C., Oklahoma City, OK, Daniel G. Clodfelter, Alan Pope, Moore & Van Allen, PLLC, Charlotte, NC, for plaintiff.

Leonard M. Parkins/John P. Melko/Tom A. Howley, Verner, Liipfert, Bernhard, McPherson, Hand, Chartered, Houston, TX, Robert S. Glass, Glass Law Firm, Tulsa, OK, for Official Committee of Unsecured Creditors.

Alfred S. Lurey, Dennis S. Meir, Kilpatrick Stockton LLP, Atlanta, GA, Sidney K. Swinson, Gable & Gotwals, Tulsa, OK, for Official Committee of Asset–Backed Securityholders.

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

DANA L. RASURE, Bankruptcy Judge.

On July 23, 1999, Plaintiff Bank of America, formerly known as NationsBank, N.A., ("BOA") filed its First Amended Adversary Complaint (the "Complaint") (Adversary Docket # ("Adv.Doc.") 34) on behalf of itself and as an agent for others,[1] seeking an order declaring that approximately $66 million in funds held by Defendant Commercial Financial Services, Inc. ("CFS") had been impressed with a constructive or resulting trust in BOA's favor.[2]

1. Enterprise Funding Corporation ("Enterprise") and Kitty Hawk Funding Corporation ("Kitty Hawk"), both asset-backed commercial paper conduits, originally purchased the trust note at issue herein (later defined as the "Series Note"). At all relevant times, BOA acted as agent for Enterprise and Kitty Hawk in connection with the purchase of the Series Note. Prior to the commencement of this action, BOA and "Alternate Purchasers" (consisting of Norwest Bank Minnesota, N.A.; The Fuji Bank, Limited; Fleet Bank, N.A.; Cooperatieve Centrale Raitteisen–Boerenleenbank B.A., Rabobank, Nederland, New York Branch; and their successors and assigns) purchased Enterprise and Kitty Hawk's interest in the Series Note and succeeded to all rights and obligations of Enterprise and Kitty Hawk. BOA and the Alternate Purchasers were the holders of the Series Note at the time this action was commenced. BOA seeks relief on behalf of itself and as agent for the Alternate Purchasers.

2. In its Complaint and in an earlier version of the Complaint, BOA also sought an injunction prohibiting dissipation of the funds claimed by BOA during the pendency of this proceeding. BOA also filed, in the main bankruptcy case, motions for relief under 11 U.S.C. § 363(e) seeking adequate protection of its claimed interest in the funds. Orders were entered by agreement of the parties providing that certain of the disputed funds or their proceeds would be deposited into a segregated account pending the resolution of this adversary proceeding. See Order Regarding NationsBank, N.A.'s Motion for Relief Under 11 U.S.C. § 363(e) entered May 25, 1999 (Bankruptcy Docket # ("Doc.") 787); Amended Order Approving Agreement and Continuing in Part Bank of America, N.A.'s Second Motion for Relief Under 11 U.S.C. § 363(e) entered August 18, 1999 (Doc. 1151); and Order Regarding Second Motion for Relief Under 11 U.S.C. § 363(e) entered October 25, 1999 (Doc. 1501) (collectively the "Section 363 Orders"). As BOA has never asked to have its request for preliminary injunction set, the Court assumes that BOA's concerns regarding dissipation of the disputed property were satisfactorily addressed upon the entry of the Section 363 Orders.

As of the date of this Order, a plan has been confirmed in which a segregated reserve ac-

In response to the Complaint, the parties have filed the following pleadings:

- Commercial Financial Services, Inc.'s Motion to Dismiss First Amended Adversary Complaint and Memorandum of Law in support thereof, both filed August 3, 1999 (Adv.Doc.35, 36) (collectively "CFS's Motion to Dismiss")

- Bank of America, N.A.'s Objection to Defendant's August 3, 1999 Motion to Dismiss, filed September 1, 1999 (Adv. Doc.43) ("BOA's Objection")

- Commercial Financial Services, Inc.'s Reply in Support of Motion to Dismiss First Amended Adversary Complaint, filed October 5, 1999 (Adv.Doc.49)

- Bank of America, N.A.'s Surreply to Commercial Financial Services, Inc.'s October 5, 1999 Reply in Support of its August 3, 1999 Motion to Dismiss, filed November 15, 1999 (Adv.Doc.67) ("Surreply")

- Commercial Financial Services, Inc.'s Sur–Surreply, filed January 28, 2000 (Adv.Doc.81) ("Sur–Surreply")

On December 22, 1999, the Court granted the motions of the Asset–Backed Securityholders Committee (the "ABS Committee") and the Official Committee of Unsecured Creditors (the "OCUC", collectively the "Committees") to intervene in this matter to protect their claims to the funds claimed by BOA in the Complaint. The OCUC adopted CFS's Motion to Dismiss in toto as its position. Thereafter, the following pleadings were filed:

- Motion of the Official Committee of Asset–Backed Securityholders to Dismiss Adversary Proceeding and Memorandum of Law in Support thereof, both filed January 28, 2000 (Adv.Doc.79, 80) ("ABS's Motion to Dismiss")

- Bank of America's Objection to the ABS Committee's October 22, 1999[sic] Motion to Dismiss, filed March 3, 2000 (Adv. Doc.86)

The parties and intervenors have supplemented their memoranda as follows:

- Commercial Financial Services, Inc.'s Supplement in Support of Motion to Dismiss, filed November 17, 2000 (Adv. Doc.88) ("CFS's First Supplement")

- Official Committee of Unsecured Creditors' Supplement in Support of Motion to Dismiss, filed December 5, 2000 (Adv. Doc.94) ("OCUC's Supplement")

- Bank of America N.A.'s Combined Response to Commercial Financial Services, Inc.'s and the Official Committee of Unsecured Creditors' Supplements to Motion to Dismiss, filed December 20, 2000 (Adv.Doc.96) ("BOA's Response to Supplements")

- Commercial Financial Services, Inc.'s Second Supplement in Support of Motion to Dismiss, filed June 8, 2001 (Adv. Doc.97) ("CFS's Second Supplement")

- Bank of America, N.A.'s Response to Commercial Financial Services, Inc.'s June 8, 2001 Second Supplement in Support of its Motion to Dismiss (filed June 28, 2001) (Adv.Doc.100) ("BOA's Response to Second Supplement").

## I. Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334; 157(a) and (b)(2)(A), (B) and (O); and Miscellaneous Order No. 128 of the United States District Court for the Northern District of Oklahoma: Order of Referral of

count has been established by the CFS Liquidating Trustee in the approximate amount of $53 million for the payment of BOA's claim if it is successful in this adversary proceeding. *See* Second Amended Plan of Orderly Liqui-

dation (Doc. 3304) at 4, ¶ 23–25; at 13, ¶ 4.3; at 30, ¶ 5.40; and Exhibit E (as confirmed by Order Confirming Second Amended Plan of Orderly Liquidation, filed September 14, 2001 (Doc. 3306)).

Bankruptcy Cases effective July 10, 1984, as amended.

## II. Standard for evaluating motion to dismiss

In evaluating a motion to dismiss for failure to state a cognizable claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (made applicable to this adversary proceeding by Bankruptcy Rule 7012(b)), "it must appear beyond doubt that the plaintiff can prove no set of facts that would entitled him to relief." *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984). The Court must "assume as true the facts asserted in the complaint and construe the well-pleaded allegations in favor of the plaintiff." *Ballen v. Prudential Bache Securities, Inc.,* 23 F.3d 335, 336 (10th Cir.1994). "All reasonable inferences must be indulged in favor of the plaintiff, ... and the pleadings must be liberally construed." *Swanson,* 750 F.2d at 813.

## III. The Complaint

The relevant well-pleaded facts that the Court assumes are true for the purpose of these motions to dismiss are summarized as follows:

In early 1998, representatives of CFS solicited BOA's[3] participation in a financing transaction to be evidenced by a Note Purchase Agreement. At all relevant times, CFS was engaged in the business of purchasing delinquent and defaulted consumer loans and receivables, primarily credit card accounts ("Loans"), and then collecting or attempting to collect on such Loans. The structure of the proposed financing transaction was thus: CFS would transfer a package of Loans (in this case, the "Series 1998–B Loans") to CF/SPC GREAT, Inc., a special purpose corporation wholly owned by CFS. CF/SPC GREAT, Inc. in turn would transfer the Series 1998–B Loans to a Delaware business trust (the "Master Trust"). The Master Trust, now holding the assets in a vehicle "remote" from CFS and its general creditors, would issue trust certificates that entitled the holders to payments of principal and interest derived from the income stream generated from CFS's collections on the Series 1998–B Loans.[4] It was envisioned that one of the trust certificate holders would be another Delaware business trust, the GREAT Series Trust 1998–B (the "Series Trust"), and that it would issue a promissory note ("Series Note") to BOA in exchange for a loan in the face amount of the Series Note. The proceeds of the loan would be transferred directly to CFS as consideration for its transfer of the Loans to the Master Trust.[5] The Series Note was to be repaid with proceeds from collections by CFS on the Series 1998–B Loans residing in the Master Trust.

To induce BOA to participate in the financing transaction, CFS represented that it had developed proprietary methods for valuing, pricing, purchasing and collecting such Loans. Central to CFS's promotion of this financing opportunity was the presentation of CFS's "ECR Model," a "proprietary model for estimating cash to be recovered [from an Loan] over time." Complaint, Exh. C, Note Purchase Agreement, at 5.

---

**3.** For the purpose of considering these motions, the Court will use the term BOA to mean BOA on behalf of itself and as agent for all other participants on the purchasing side of the Agreement, including Enterprise, Kitty Hawk and the Alternate Purchasers.

**4.** CFS was to collect a servicing fee from the Master Trust for servicing the trust's assets.

**5.** All of the summarized transfers were to occur simultaneously.

BOA performed a due diligence investigation prior to committing to participate in the proposed transaction with CFS. Among other things, CFS provided BOA with a notebook labeled "Due Diligence Book: GREAT 1998–A Dated: April 30, 1998," a copy of which is attached to the Complaint as Exhibit A (the "Due Diligence Book"). The Due Diligence Book included histories, by way of graphs and tables, of collections and payments made with respect to loans packaged for prior similar securitization transactions. The graphs and tables indicate that those collections and payments consistently exceeded the monthly ECR. The Due Diligence Book did not disclose that the collection and payment data contained therein included revenue that CFS obtained from selling packages of the securitized Loans to a related party, DIMAT, Inc. ("DIMAT"), at inflated prices.[6]

In performing its due diligence, BOA noted that CFS's collection data for March 1998 was significantly lower than previous or subsequent months. BOA made specific inquiry to CFS regarding this anomaly. In response, CFS's president, Bill Bartmann, and its investment relations director, Gertrude Brady, represented on two occasions that the aberration was occasioned by a reorganization of personnel and operations during the month of March 1998 when in fact the anomoly was the result of failing to close a bulk sale of Loans to DIMAT in an amount sufficient to maintain the facade that CFS had met (or exceeded) its collections target during that month.

CFS also stated that it did not service Loans "for third parties." Complaint, Exh. B. CFS had in fact been servicing the Loans that it had sold to DIMAT.

Relying on the false and/or misleading information provided by CFS, on July 1, 1998, BOA entered into a Note Purchase Agreement (the "Agreement") with CFS and CF/SPC GREAT, Inc., obligating itself to purchase, from time to time, "certain floating rate Notes issued by a Series Note Issuer." Agreement (Exh. C to Complaint) at 1. In the Agreement, CFS warranted to BOA the accuracy of all material written information furnished to BOA by CFS in connection with the transaction. Agreement at ¶ 3.1(d).[7]

On September 30, 1998, pursuant to the Agreement, CFS transferred the Series 1998–B Loans to CF/SPC, who transferred the Series 1998–B Loans to the Master Trust. The Master Trust issued trust certificates to the Series Trust, and the Series

---

6. The Court recognizes that the allegation that CFS made bulk sales of Loans to DIMAT and concealed that fact from investors may be *the* lynchpin issue of fact and/or law in various complex multiparty lawsuits between investors and various officers and directors of CFS pending in District Court. Clearly, this Court is not making any finding regarding the allegation, but rather is taking, as it must, the well-pleaded facts, and all reasonable inferences therefrom, in the light most favorable to BOA.

7. This subsection provides—
 *Accuracy of Information.* All written information heretofore furnished by an Executive Officer of the Administrator [CFS] or Transferor [CF/SPC GREAT, Inc.] to any Purchaser [Kitty Hawk Funding Corporation and Enterprise Funding Corporation], any Alternate Purchaser [BOA and others], the Administrative Agent [BOA] or the Agent [BOA] for purposes of or in connection with this Agreement or any transaction contemplated hereby and identified on an Additional Note Purchase Supplement is, and all such information hereafter furnished by such party to any Purchaser, any Alternate Purchaser or the Agent will be, true and accurate in every material respect, on the date such information is stated or certified.
 Agreement at ¶ 3.1(d) (matters in brackets added for clarity).

Trust issued a Series Note to BOA in exchange for BOA's transfer of $189 million to CFS. In transferring the funds, BOA relied upon the false and/or misleading information provided to BOA by Bartmann and Brady regarding the decline in collections in March 1998.

BOA contends that CFS's failure to disclose material information regarding the financial condition of CFS and the collection history of other securitizations, specifically that CFS had been relying on bulk sales of loans to an affiliated company at inflated prices to meet its collection goals (which materially affected the validity of CFS's representations about the integrity of the ECR Model upon which CFS's due diligence materials were based), was a knowing misrepresentation (or concealment) made with the intent that BOA rely upon the information; that BOA justifiably relied upon the information in deciding to enter into the Agreement and in purchasing the Series Note; that BOA would not have entered into the Agreement or purchased the Series Note had CFS disclosed and not concealed the information; and consequently, that CFS defrauded BOA.

On the date BOA filed its Complaint, BOA had in its possession, custody and control approximately $40,399,673.20 of CFS's funds which were in accounts in CFS's name at BOA, which BOA contends are proceeds directly traceable to BOA's purchase of the Series Note on September 30, 1998. BOA claims that the fraud alleged above is sufficient "wrongdoing" to require the Court to declare that these funds are held by CFS as trustee of a constructive trust, or, in the alternative, a resulting trust in favor of BOA.

BOA also contends that $1,000,000 of the proceeds of BOA's purchase of the Series Note were invested by CFS in certificates of deposit at Bank of Oklahoma (which certificates of deposit secured letters of credit in favor of CFS's highly paid management employees). BOA seeks a declaration that these certificates of deposit are also held by CFS in constructive (or resulting) trust for the benefit of BOA.

Finally, BOA contends that it can trace $19,793,464 of the proceeds to CFS's purchase of certain identified accounts with a face value of approximately $200 million and $4,206,536 of the proceeds to purchase other accounts it has not been able to identify. BOA seeks a declaration that the accounts are held by CFS in a constructive (or resulting) trust for the benefit of BOA. For the purposes of this Order, the Court refers to all three of BOA's potential sources of recovery as the "Fund(s)."

## IV. Theories of the Parties' Motions to Dismiss

CFS argues that BOA cannot prove any set of facts that would entitle it to a declaration of a constructive trust in BOA's favor. First, CFS contends that the Bankruptcy Code's carefully crafted priority scheme would be disrupted if one creditor were granted a constructive trust on property that should be made available to all similarly situated creditors. Second, CFS contends that BOA's claim for a constructive trust is a claim for the rescission of the sale of a security of an affiliate of CFS, and thus conflicts directly with the directive contained in Section 510(b) of the Bankruptcy Code ("Section 510(b)") that precisely such kinds of rescission claims must be subordinated to other claims.[8]

8. Section 510(b) provides—
 For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account

Third, CFS asserts that BOA's request for relief constitutes nothing more than a garden-variety "claim" under Section 101(5) of the Bankruptcy Code and thus is not properly the subject of an adversary proceeding.[9] Fourth, CFS claims that BOA's Complaint is not pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rule 7009, and in particular, that BOA fails to allege that CFS's alleged misrepresentations or omissions were material to BOA's decision to invest or that the alleged fraud has caused a loss to BOA. Additionally, in a footnote, CFS argues that BOA does not have standing to assert its claim because BOA's claim is encompassed by the claim

of Bankers Trust, the Master Trustee of the Series Trust.[10]

Both Committees echo CFS's first argument. The Committees take particular umbrage with BOA elbowing its way to the front of the distribution line and skimming $60 million "off the top" of the estate rather than sharing the entire estate with other equally innocent creditors[11] *pro rata,* or in the view of the OCUC, being placed at the back of the line, subordinate to the unsecured creditors. For obvious reasons, the ABS Committee opposes and the OCUC supports CFS's second argument—that BOA's claim (and inferentially all ABS holders' claims) should be subordinated to the unsecured creditors' claims pursuant to Section 510(b).[12]

---

of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.
11 U.S.C. § 510(b).

9. In CFS's First Supplement, CFS supplements its authorities with *Tekinsight.com, Inc. v. Stylesite Marketing, Inc. (In re Stylesite Marketing, Inc.),* 253 B.R. 503 (Bankr.S.D.N.Y. 2000), rehearing denied, 2001 WL 13212, and urges this Court to likewise rule that BOA's Complaint should be dismissed because its claim for constructive trust is "merely" a claim against the estate for rescission of the purchase of a security, and like any other such claim, must be subordinated pursuant to Section 510(b), regardless of what remedy is sought. CFS's First Supplement at 2. BOA contends that the *Stylesite* court did not consider or distinguish the cases BOA has cited to support its argument that the Fund subject to a constructive trust is not property of the estate in the first place. BOA also distinguishes *Stylesite* on the basis that the *Stylesite* court did not have to determine whether the issuer was an "affiliate" of the debtor, as is necessary in this proceeding.

10. While the Court is always interested in standing, and the case may be subject to dismissal for lack of standing, no party has convincingly briefed the issue at this point.

11. The ABS Committee objects to BOA obtaining a windfall when, in its view, CFS's financing through securitizations was a Ponzi scheme by which all ABS holders were equally misled by CFS and therefore they should all equally share (that is, *pro rata*) in CFS's assets. BOA responds that BOA was the only ABS holder that purchased a Series Note based upon the alleged misrepresentations and omissions made to BOA. BOA believes that the other ABS holders are not entitled to share in BOA's hoped-for recovery because the other holders were not victims of the specific wrongdoing pleaded by BOA. BOA also claims that the fact that it can trace its funds into specific accounts enhances its claim over the claims of ABS holders whose funds had already been commingled and/or expended. Thus, BOA rejects the ABS Committee's argument that BOA is just one of many equally innocent lenders/investors.

12. The ABS Committee urges that "[t]he abuse which section 510(b) was enacted to remedy simply is not presented" in this case. ABS's Motion to Dismiss at 14. The ABS Committee argues that by asserting securities fraud claims against CFS, its constituents (including BOA) are not equity owners seeking to "bootstrap their way to parity with, or preference over, general creditors." ABS's Motion to Dismiss at 15, *citing* John J. Slain & Homer Kripke, THE INTERFACE BETWEEN SECURITIES REGULATION AND BANKRUPTCY—ALLOCATING

In response, BOA contends that constructive trusts are commonly established in bankruptcy proceedings and that several federal circuit courts of appeal, including the Tenth Circuit, have recognized that constructive trusts that arise *prior* to the bankruptcy petition deprive the estate of any interest in the *res* of the trust. BOA contends that if this Court is convinced that CFS's fraud induced BOA to part with $189 million and finds that BOA has proven all elements of constructive trust under Oklahoma law, such a trust in BOA's favor would have arisen at the time of CFS's wrongdoing, *i.e.*, prepetition, and because the Fund was held in title only by CFS prepetition, the Fund never became property of the estate. Thus, says BOA, it does not seek to recover property of the estate, but rather seeks a recognition and declaration that the *res* of the trust is *not* property of the estate under Section 541(d).[13] Because the Fund is excluded from the estate, BOA argues, its claim is *superior* to those claiming against property of the estate, and BOA's claim cannot be subordinated to those claimants under Section 510(b).[14]

BOA also argues that it is not subject to subordination under Section 510(b) because the Series Trust is not an "affiliate" of CFS as the term is used in Section 510(b) because affiliates must be "persons." Although the definition of "person" includes "business trusts," BOA contends that the Series Trust is not a "business trust" and thus is not a "person" and not an "affiliate." BOA also argues that the Series Note is not a "security" subject to subordination under Section 510(b) and that even if BOA's claim was subject to Section 510(b), its claim is a secured claim with priority over unsecured creditors.

Finally, BOA asserts that it has properly pleaded all elements of fraud, including materiality and causation. But, BOA argues, it need not prove fraud in order to be

THE RISK OF ILLEGAL SECURITIES ISSUANCE BETWEEN SECURITYHOLDERS AND THE ISSUER'S CREDITORS, 48 N.Y.U.Law Rev. 261 (1973) (hereinafter "Slain & Kripke"). The ABS Committee claims that their securities are debt instruments. In the ABS Committee's view, the claims of their constituents are in the nature of general unsecured claims, not equity claims. Thus, the ABS Committee argues that the Court should ignore Section 510(b) in this case because it was never intended to be applied to fraud claims involving the sale of debt securities.

13. Section 541(d) provides—

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

14. In OCUC's Supplement, the OCUC makes the argument that property that is not part of a debtor's estate under Section 541(d) "may still be brought into the estate and preserved for the estate's creditors under § 544(a)," citing *Mullins v. Burtch (In re Paul J. Paradise & Assoc., Inc.)*, 249 B.R. 360 (D.Del.2000). BOA objects to the insertion of a new theory of recovery after the briefing cycle has concluded and objects to the OCUC's standing to assert a trustee's "strong-arm avoidance powers." Further, BOA argues that the strong arm power exercised by the trustee in the *Mullins* case was that under Section 544(a)(3), giving the trustee rights of a bona fide purchaser for value of *real property*, but that strong arm powers conferred by Section 544(a)(1) and (2) only give the trustee rights of a judicial lien or execution creditor as to personal property, and a lien creditor's rights are not sufficient to defeat those of a beneficiary of a constructive trust containing personal property.

entitled to a declaration of a constructive trust in its favor, but must only show that property was "wrongfully obtained." This element, BOA contends, is satisfied by the allegations in the Complaint.

CFS counters that Oklahoma constructive trust law should not be applied in a bankruptcy case to subvert fundamental bankruptcy principles, such as priority and equality in distribution. CFS argues that the policy of Oklahoma's law—that is, to prevent unjust enrichment of wrongdoers—is inapplicable in this case because due to the bankruptcy, the purported wrongdoer, CFS, has not benefitted from the fraud.[15] CFS contends that it is unfair to deprive other innocent creditors who gave value to CFS from a share of the fund transferred to CFS by the last lender/investor. CFS also argues that Oklahoma common law of constructive trusts is preempted by federal bankruptcy law pursuant to United States Supreme Court precedent that "property interests are created and defined by state law ... unless some federal interest requires a different result."[16] CFS contends that imposition of a constructive trust in this case would conflict with overriding federal interests in promoting a uniform priority scheme and equality of distribution and further would eviscerate the federal interest in preventing investors, whose behavior involves taking certain risks in exchange for potentially greater gains, from diluting the recovery of unsecured creditors who do not take such risks.[17]

In order for Section 510(b) to apply at all, the Series Trust must be found to be an "affiliate" of CFS as a matter of law based solely upon the Complaint and its exhibits incorporated therein. CFS contends that BOA admits in its Complaint that the Series Trust is a "Delaware business trust" and that even to the extent that BOA retracts that admission, the Complaint and the exhibits incorporated therein must be interpreted to find that the Series Trust is an affiliate of CFS pursuant to Section 101(2)(C) of the Bankruptcy Code.[18] CFS also argues that BOA admits in its Complaint and the exhibits incorporated therein that the Series Note is a "security;" that the text and legislative history of Section 510(b) indicate that the securities that Section 510(b) subordinates includes debt securities as well as equity

---

15. In its Surreply, BOA asserts that the Court cannot force BOA to share funds to which it is solely entitled, and which are not property of the estate, with other CFS's creditors.

16. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

17. Fundamentally, the arguments regarding the priority of BOA's claim against the Fund are reduced to whether BOA's claim to property should be examined in isolation rather than within the milieu of a bankruptcy proceeding, whereupon state property law may exclude the Fund from the estate (and thus from the clutches of other creditors) on the basis of equitable considerations the state has developed, *or* whether federal law and policy should intervene to preempt the application of state property law when that state law contradicts the bankruptcy policy that subor-

dinates investors in securities to a debtor's general unsecured creditors.

18. Section 101(2) states—

"[A]ffiliate" means—

*****

(C) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor....

11 U.S.C. § 101(2)(C).

In its Surreply, BOA asserts that the Court cannot summarily determine from the pleadings whether the Series Trust is a "business trust" and thus an "affiliate" of CFS. BOA contends that further factual development is necessary. BOA further contends that CFS wrongly relies upon Delaware law, rather than federal law, in defining a "business trust."

securities; and that the Bankruptcy Code definition of "security" includes debt instruments.[19] CFS charges that BOA's claim that the Series Note is an "asset-backed security" reinforces the notion that it is a "security."[20] Finally, CFS rebukes BOA's claim that it holds a secured claim *against the estate* by virtue of its "asset-backed security," because the "collateral" against which BOA makes its claim is not property of the estate but rather is property of a third party, *i.e.*, the Master Trust.

CFS dismisses BOA's argument that BOA need not allege fraud with particularity because the elements of constructive trust merely require "wrongdoing" rather than fraud. CFS contends that the "wrongdoing" must be a cognizable tort, and in this case, BOA is alleging fraud; thus, CFS argues, *all* elements of fraud must be pleaded with particularity.

## V. Conclusions of Law

A. *This adversary proceeding is authorized by Bankruptcy Rule 7001.*

■ Bankruptcy Rule 7001 provides—

An adversary proceeding is governed by the rules of Part VII. The following are adversary proceedings:

(1) a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002;

(2) a proceeding to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d);

*****

(7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief;

*****

(9) a proceeding to obtain a declaratory judgment relating to any of the foregoing....

Fed.R.Bankr.P. 7001.

The Complaint seeks a *declaration* of a constructive trust in BOA's favor with respect to the Funds that BOA alleges can be traced to various segregated accounts. The Court concludes that such a claim *must* be brought by adversary proceeding under one or all of the above-quoted paragraphs of Rule 7001. This is a proceeding to "recover money or property" (Rule

---

**19.** In its Surreply, BOA denies that it had argued that the Series Note is not a "security." BOA clarifies its argument in the Surreply by insisting that if the Court concludes that Section 510(b) applies, then the Court must inquire into the kind of security BOA holds in order to determine the claims to which its claim is subordinate. A complete factual record is necessary for that determination, BOA argues, rendering dismissal at this stage inappropriate.

**20.** The Rules and Regulations for National Credit Union Administration, 12 CFR § 704.2, reprinted in 62 FR 12929, *12938, provides a concise, helpful definition of "asset-backed security" as follows:

> Asset-backed security means a security that is primarily serviced by the cashflows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period plus any rights or other assets designed to assure the servicing or timely distribution of proceeds to the securityholders. This definition excludes those securities referred to in the financial markets as mortgage-backed securities (MBS), which includes collateralized mortgage obligations (CMOs) and real estate mortgage investment conduits (REMICs).
>
> *Id.*

7001(1)); to determine BOA's and CFS's interests in the Fund (Rule 7001(2)); to "obtain ... equitable relief" (Rule 7001(7)); and for a "declaratory judgment relating to" paragraphs (1), (2) and (7) (Rule 7001(9)). The Court also notes that the Fifth Circuit Court of Appeals has held that a creditor's demand for a declaration of a constructive trust was *required* to be brought by filing an adversary proceeding. *See Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 438 (5th Cir. 1994). Thus, the Complaint cannot be dismissed on the ground that it has been improperly asserted in an adversary proceeding.

B. *Is BOA's claim to a constructive trust remedy subordinated to the interests of unsecured creditors pursuant to Section 510(b) as a matter of law?*

■ Clearly, this case is not about whether a constructive trust may *ever* be established in the bankruptcy context when its application would exclude from the estate property wrongly obtained by the debtor prepetition. The Tenth Circuit has spoken on this issue and has recognized that in certain circumstances, a constructive trust may be an appropriate remedy to vest property titled in the debtor's name in the party who in equity should own such property. *See United States Dept. of Energy v. Seneca Oil Co. (In re Seneca Oil Co.)*, 906 F.2d 1445 (10th Cir. 1990).[21] Unique to this case, however, is that BOA claims that a constructive trust arose when CFS fraudulently induced

BOA to purchase the Series Note, which CFS and the OCUC contend is a security of an affiliate of the debtor, which immediately implicates application of the clearly articulated federal bankruptcy policy, demonstrated by Section 510(b), that claimants seeking *rescission*[22] of a purchase of securities of the debtor or its affiliates should be subordinated to claimants with equal or superior claims.

The federal policy involved here is not merely the general bankruptcy policy of "ratable distribution" but rather is a *specific* policy requiring subordination of claimants who voluntarily assume the risk of fraud and insolvency by purchasing a security in order to obtain potential benefits beyond those of a general unsecured creditor. While the expectation of a general unsecured creditor is merely to be paid for a good or service, or to be repaid with interest, the expectation of a purchaser of a security can include an interest in proceeds or profits or other benefits unavailable to general unsecured creditors.

In drafting Section 510(b), Congress considered and adopted the rationale espoused by Professors Slain and Kripke (*see* footnote 12, *supra*) for subordinating claims for rescission of securities transactions as follows:

> [T]he risk of illegality in securities issuance should be borne by those investing in securities and not by general creditors. Placing rescinding shareholders on a parity with general creditors shifts the risk of an illegal stock offering to general creditors. The general credi-

---

**21.** Although *Seneca* settles the issue of whether a constructive trust may *ever* be imposed in a bankruptcy context in the Tenth Circuit, it does not address, nor did the circuit panel consider, numerous issues related to the circumstances under which a constructive trust might be sought and the relative weight that should be given to state property law and

federal bankruptcy policy in determining the outcome of such a claim.

**22.** The term "constructive trust" is an expression encompassing the equitable concepts of rescission and restitution. *See* Restatement (Third) of Restitution, Pt. II, Ch. 2, Introductory Note (Tentative Draft No. 1, 2001).

tors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had the potential benefit to shift the loss to general creditors.

\*\*\*\*\*

The bill generally adopts the Slain/Kripke position, but does so in a manner that is administratively more workable. The bill subordinates in priority of distribution rescission claims to all claims that are senior to the claim or interest on which the rescission claims are based. Thus, a rescission claim resulting from the purchase of a subordinated debenture would share in the proceeds of the estate before equity security holders but after general unsecured creditors.

H.R.Rep No. 95–595, 95th Cong. 1st Sess. at 195–96 (1977), U.S.Code Cong. & Admin.News 1978, at 5787, 6156, 6157, reprinted in COLLIER ON BANKRUPTCY (hereinafter "COLLIER"), App.C, Pt. 4(d)(i) at 1308–09 (Lawrence King ed., 15th ed. rev.) (1979). In following Slain/Kripke's rationale, Congress expresses an intent to overrule the then-current law that "permits a rescinding security holder to share *pari passu* in the bankruptcy estate with general creditors," a view espoused in the case of *Oppenheimer v. Harriman Nat'l Bank & Trust Co.*, 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937), as well as the result of the *In re Rhine* case, which held: "[I]f a security holder can trace the consideration paid into proceeds of the estate then he can, in straight bankruptcy, either reclaim the consideration or assert a security interest in the proceeds as a secured creditor." *Id.* at 195, COLLIER, App.C, Pt. 4(d)(i) at 1307, *citing In re Rhine*, 241 F.Supp. (D. Colo 1965) [sic]. *Rhine* permitted "reclamation" by defrauded investors of funds traceable from their purchase of oil and gas working interests (which Congress

likened to "investment contracts," thus securities) to the seller/debtor's bank accounts. *See In re Rhine*, 241 F.Supp. 86, 91, *rehearing denied*, 242 F.Supp. 127 (D.Colo.1965). Slain and Kripke sharply criticized the outcome of *Rhine*, stating—

> It is important to focus on the practical effects of the *Rhine* decision. In addition to the rescinding purchasers of working interests, the bankrupt had other creditors whose claims arose from the operation of the venture: open-account vendors, laborers and other suppliers of goods and services. The result of a successful reclamation would have been the payment of all traceable assets of the estate to the former owners of the equity interest in the business, with general creditors sustaining a total loss. Thus, in any situation where tracing is possible, *Rhine* suggests that rescinding equity investors have a real possibility of bootstrapping their way to secured creditor status. Yet, the same rescinding investors would have received the entire benefit of the venture had it prospered. This is an enviable posture clearly contrary to the usual rule that leveraged opportunity for gain also entails leveraged, rather than sheltered, risk of loss.

Slain & Kripke, at 279. They continued—

> The time has come for a reconsideration of the preference given to restitutionary interests, at least in the context of rescinding securityholder claims. There are compelling reasons why the general premise of American law that the victims of the wrongdoer should prevail over his general creditors should not apply here....

> The *Oppenheimer–Rhine* view ... is tunnel vision. It fails to see that in any case of issuer insolvency the claims of rescinding stockholders can be satisfied only out of assets which otherwise would

be allocated to making innocent parties whole. The parties did nothing to create the rescinder's problems and in the overwhelming majority of cases advanced money, labor or credit in reliance on the existence of the equity or junior debt cushion which the rescinder purported to provide. The *Oppenheimer–Rhine* approach can be justified only if it is assumed that the policies underlying federal and state securities law are of such transcendental importance that they necessarily displace all other doctrines of law and all considerations of simple fairness. It is our thesis that no rational basis exists for such an assumption.

*Id.* at 285–86. Congress concurred with Slain and Kripke's critique of the then-current law and adopted as federal bankruptcy policy the Slain/Kripke view that once bankruptcy has been filed, claims of rescinding security holders who might otherwise be entitled to recover traceable assets ahead of or untraceable assets in *para passu* with general creditors should *not* be permitted to recover any assets until general unsecured creditors have been made whole. The policy is justified by the fact that in exchange for the upside benefits not shared with general creditors, security holders should be allocated the risk that the security transaction was tainted by fraud, a risk that general creditors had no opportunity to avoid.

■ This well-articulated federal policy is central to CFS's argument for dismissal. BOA's constructive trust claim parallels the *Rhine* plaintiffs' "reclamation" claim. Congress expressly overruled the result of *Rhine* and iterated a policy that *all* claims for rescission by defrauded investors, even rescission claims that seek a remedy through the fiction of a constructive trust, should stand behind innocent general unsecured creditors. Providing additional justification is the fact that unsecured creditors rely "on the equity cushion provided by the shareholder investment." *In re Lernout & Hauspie Speech Products, N.V. v. Baker (In re Lernout & Hauspie Speech Products, N.V.)*, 264 B.R. 336, 342 (Bankr.D.Del.2001), *quoting In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 830 (9th Cir.2001). In this case, CFS's unsecured creditors were dependent upon the proceeds from the Series Note and other securitization investments not only as a "cushion" but as CFS's principal source of payment of its general operating expenses. Thus, the Court recognizes that strong arguments exist that provide justification for the subordination of BOA's claim as a matter of bankruptcy policy.

BOA asserts that the Court cannot even consider subordination of its rescission claim under Section 510(b) because the property it seeks to recover is not and has never been property of the estate. Section 541(d) provides—

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). The question in the Court's mind is whether, in enacting Section 541(d), Congress *intended* Section 541(d) to apply to claims of defrauded investors seeking rescission, thus retreating from the clearly established policy that

defrauded investors not recover dollar for dollar ahead of unsecured creditors.

■ In interpreting two statutes that appear to conflict, the United States Supreme Court has favored maintaining the effect of both statutes as drafted whenever possible.

> "[W]hen two statutes are capable of coexistence," . . . "it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); *Pittsburgh & Lake Erie R. Co. v. Railway Labor Executives' Assn.*, 491 U.S. 490, 510, 109 S.Ct. 2584, 2596–2597, 105 L.Ed.2d 415 (1989).

*Vimar Seguros y Reaseguros, S.A. v. M/V SKY REEFER*, 515 U.S. 528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995).

With the Supreme Court's admonition in mind, this Court has a duty to determine whether Congress intended Section 541(d) to limit the effect of Section 510(b)'s subordination of rescission claims. Legislative comments concerning Section 541(d) do not suggest any such intention. The original House Bill, H.R. 8200, did not include a separate paragraph in Section 541 to exclude the equitable interest in property in which the debtor had a only legal interest. The very definition of property of the estate included only the legal or equitable interests the debtor had as of the commencement of the bankruptcy case. *See* H.R.Rep. 95–595, H.R. 8200, 95th Cong., 1st Sess. (1977), *reprinted in* COLLIER, App.B, Pt. 4(d) at 930–31. Thus, it appears that the House did not envision a need for the exclusion. Nor does the language of Section 541(d) appear in the re-

port of the Committee on the Judiciary. *See* H.R.Rep. 95–595, 95th Cong. 1st Sess., 175–77 (1977), *reprinted* in COLLIER, App.C, Pt. 4(d)(i) at 1282–84.

On the Senate side, its Committee on the Judiciary reported on its analogous bankruptcy bill, Senate Bill 2266, in S.Rep. 95–989, 95th Cong., 2d Sess. (1978), *reprinted in* COLLIER, App.D, Pt. 4(e)(i). With respect to subordination of rescission claims, the Committee did not purport to follow Slain and Kripke, but did state that Section 510(b)—

> requires the court to subordinate in payment any claim for rescission of a purchase or sale of a security of the debtor or of an affiliate, . . . to all claims and interests that are senior to the claim or interest represented by the security. Thus, . . . subordination varies with the claim or interest involved. If the security is a debt instrument, the damages or rescission claim will be granted the status of a general unsecured claim. If the security is an equity security, the damages or rescission claim is subordinated to all creditors and treated the same as the equity security itself.

*Id.* at 74, COLLIER, App.D, Pt. 4(e)(i) at 2018.[23] Regarding the scope of property of the estate under subsection (a) of Section 541, the Committee noted—

> Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the

---

**23.** Contrary to this expression of legislative intent, the statute that was ultimately enacted treats claims for rescission of the purchase of debt securities as subordinate to "all claims or interests that are senior to or *equal* the claim or interest represented by the security." 11 U.S.C. § 510(b) (emphasis added).

bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. This section and proposed 11 U.S.C. 545 also will not affect various statutory provisions that give a creditor of the debtor a lien that is valid outside as well as inside bankruptcy, or that creates a trust fund for the benefit of a creditor of the debtor.

*Id.* at 82, Collier, App.D, Pt. 4(e)(i) at 2029.

The genesis of the present Section 541(d) was Section 541(e) of Senate Bill 2266,[24] which was designed to make clear that the bankruptcy estate did not include the beneficial interest in mortgages in which a debtor/servicer had title for the sole purpose of servicing such mortgages.

Section 541(e) confirms that current status under the Bankruptcy Act of bona fide secondary mortgage market transactions as the purchase and sale of assets. Mortgages or interests in mortgages sold in the secondary market should not be considered as part of the debtor's estate. To permit the efficient servicing of mortgages or interests in mortgages the seller often retains the original mortgage notes and related documents, and the purchaser records under State recording statutes the purchaser's ownership of the mortgages or interests in mortgages purchased. Section 541(e) makes clear that the seller's retention of the mortgage documents and the purchaser's decision not to record do not impair the asset sale charac-

ter of secondary mortgage market transactions. The committee notes that in secondary mortgage market transactions the parties may characterize their relationship as one of trust, agency, or independent contractor. The characterization adopted by the parties should not affect the statutes in bankruptcy of bona fide secondary mortgage purchases and sales.

*Id.* at 83–84, *reprinted in* Collier, App.D, Pt. 4(e)(i) at 2030–31.

A compromise bill presented the first rendition of Section 541(d) as we know it today. *See* 124 Cong.Rec. H11047, at H11060, *reprinted in* Colllier, App.D, Pt. 4(f)(i) at 2283. In a joint explanatory statement, the floor managers of both houses of Congress elaborated on the reconciliation of H.8200 and S.2266. Regarding Section 541(d), the joint committee observed—

Section 541(d) of the House amendment is derived from section 541(e) of the Senate amendment and reiterates the general principle that where the debtor holds bare legal title without any equitable interest, that the estate acquires bare legal title without any equitable interest in the property. Examples of this are mortgages sold for which legal title has been retained for servicing. Similarly, if the debtor holds an equitable interest in property without legal title, the estate would acquire only the equitable interest of the debtor in property and not the legal title. Thus, as section 541(a)(1) clearly states, the es-

---

24. Section 541(e) of S.2266 provided—
Notwithstanding the provisions of subsection (a) of this section and section 544, a mortgage secured by real property, or an interest in such a mortgage sold by the debtor but of which the debtor has retained legal title for the purpose of servicing, or supervising the servicing of, the mortgage

or an interest therein shall be deemed property of held by the debtor for the benefit of the owner or holder of such mortgage or interest therein and shall not become property of the estate.

Proposed 11 U.S.C. § 541(e), S.2266 (1978), *reprinted in* Collier, App.C, Pt. 4(e), at 1800.

tate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate except to the extent that defenses that are personal against the debtor are not effective against the estate.

*Id.* at H11096, *reprinted in* Collier, App.D, Pt. 4(f)(i), at 2446. Further, in the Senate debate on the compromise bill, the Senate managers' version of the joint explanatory statement provided—

Section 541(d) of the House amendment is derived from section 541(e) of the Senate amendment and reiterates the general principle that where the debtor holds bare legal title without any equitable interest, that the estate acquires bare legal title without any equitable interest in the property. The purpose of section 541(d) as applied to the secondary mortgage market is identical to the purpose of section 541(e) of the Senate amendment and section 541(d) will accomplish the same result as would have been accomplished by section 541(e). Even if a mortgage seller retains for purposes of servicing legal title to mortgages or interests in mortgages sold in the secondary mortgage market, the trustee would be required by section 541(d) to turn over the mortgages or interests in mortgages to the purchaser of those mortgages.

The seller of mortgages in the secondary mortgage market will often retain the original mortgage notes and related documents and the seller will not endorse the notes to reflect the sale to the purchaser. Similarly, the purchaser will often not record the purchaser's ownership of the mortgages or interests in mortgages under State recording statutes. These facts are irrelevant and the seller's retention of the mortgage documents and the purchaser's decision not to record do not change the trustee's obligation to turn the mortgages or interests in mortgages over to the purchaser. The application of section 541(d) to secondary mortgage market transactions will not be affected by the terms of the servicing agreement between the mortgage servicer and the purchaser of the mortgages. Under section 541(d), the trustee is required to recognize the purchaser's title to the mortgages or interests in mortgages and to turn this property over to the purchaser. It makes no difference whether the servicer and the purchaser characterize their relationship as one of trust, agency, or independent contractor.

The purpose of section 541(d) as applied to the secondary mortgage market is therefore to make certain that secondary mortgage market sales as they are currently structured are not subject to challenge by bankruptcy trustees and that purchasers of mortgages will be able to obtain the mortgages or interests in mortgages which they have purchased from trustees without the trustees asserting that a sale of mortgages is a loan from the purchaser to the seller.

Thus, as section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate except to the extent that defenses which are personal against the debtor are not effective against the estate.

124 Cong.Rec. S17403, at S17413, *reprinted in* Collier, App.D, Pt. 4(f)(iii) at 2259–60. Thus, as set forth above ad nauseam, Section 541(d) was enacted to insure that the secondary mortgage market was not

disrupted by bankruptcy trustees who might seek to exploit Section 541(a)(1) to claim assets titled in the name of a debtor/servicer solely for servicing purposes as property of the estate.

In contrast, the original House bill specifically "subordinate[d] for purposes of distribution *any claim for rescission* of a purchase or sale of a security of the debtor or of an affiliate." H.R.Rep. No. 95–598, H.R. 8200, 95th Cong., 1st Sess., *reprinted in* COLLIER, App.B, Pt. 4(d) at 921 (emphasis added). The report of the House Judiciary Committee introduced the *Rhine* case, in which monies were returned to defrauded investors to the extent the proceeds were traceable, as one example of a trend toward permitting rescission of investment transactions which, when viewed from a risk allocation perspective, unfairly shifted the risk of loss from fraud to innocent creditors. Congress made a calculated decision to prefer innocent creditors over defrauded investors by enacting Section 510(b) and causing subordination of "any claim for rescission." *See* H.R.Rep.

No. 95–595, 95th Cong., 1st Sess., 194–96, *reprinted in* COLLIER, App.C, Pt. 4(d)(i) at 1306–09.[25]

■ In order not to do violence to the well-documented intent that Section 510(b) subordinates all rescission claims, including claims for constructive trust, as demonstrated by Congress's rejection of the outcome of the *Rhine* case, Section 541(d) may be interpreted to apply only to express or resulting trusts created by the *intent* of the parties, such as where "a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest,"[26] and perhaps even to constructive trusts that do not seek the rescission of purchases or sales of securities, such as the "constructive trust" created by the debtor's possession of insurance benefits paid by the insurer apparently with the *intention* that the debtor pay the medical provider, as described in legislative history.[27]

---

**25.** The joint explanations of the House and Senate on the compromise bill do not address Section 510(b) in any meaningful way.

**26.** The Court is skeptical that Congress intended to except from the reach of Section 510(b) the case of a rescinding investor who can trace its investment in enacting Section 541(d) without any comment as to such an intent.

**27.** The House's example of a constructive trust, as it turns out, has been roundly criticized by courts as "too broad" and "assuming certain unexpressed facts" such as a pre-existing assignment of the proceeds by the debtor to the medical provider. *In re Rowland,* 140 B.R. 206, 210 (Bankr.S.D.Ohio 1992), *quoting In re Moskowitz,* 13 B.R. 357, 360–61 (Bankr. S.D.N.Y.1981). The issue was addressed by Judge Queenan in *CRS Steam, Inc. v. Engineering Resources, Inc. (In re CRS Steam, Inc.),* 225 B.R. 833 (Bankr.D.Mass.1998), as follows—

There can be no dispute that a beneficial interest in property held by a debtor in

trust for another does not become part of the bankruptcy estate if the parties expressly or impliedly intended to create a trust. But a constructive trust, being a remedy rather than a trust, is another matter. The example given of a medical expense payment is curious. It describes a true trust if the debtor and the insurance company expressly or impliedly intended to create a trust. Or, if the debtor had assigned his insurance claim to the medical service provider, it describes a bailment rather than a trust. The example does not describe a constructive trust unless the insurance company made the payment to the debtor, rather than to the provider, as the result of its mistaken belief that the debtor had already paid the bill. There is therefore not enough in this legislative snippet to conclude Congress intended to exclude from the bankruptcy estate property held under a constructive trust as well as property held under a true trust. Most important, exclusion from the estate of an equitable interest in constructive trust property conflicts with

■ Further, Section 541(d) does not restrict the Court from balancing competing policies and equities before decreeing a constructive trust remedy. A state law constructive trust claim that might prevail in other circumstances may not prevail when the party seeking to rescind the purchase of a security had a better opportunity to avoid the risk of fraud than did a debtor's general unsecured creditors. Moreover, *Butner* offers courts the latitude to determine whether Section 510(b), being the more specific statute addressing rescission of securities transactions, articulates a policy worthy of assuming precedence over the contrary effect that state constructive trust law would dictate.[28]

■ However, taking first things first, the *threshold* issue in determining whether to grant CFS's Motion to Dismiss on the ground that BOA's claim is subject to mandatory subordination under Section 510(b) is whether the facts alleged in the Complaint require the Court to conclude, as a matter of law, that the Series Note falls *within the statutory definition of claims subordinated by Section 510(b).* Again, Section 510(b) provides—

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under

section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

According to 11 U.S.C. § 101(49)(A)(i), the term "security" includes a note. While BOA contends that the Series Note should not be considered a security because it did not confer the benefits of equity securities, *i.e.,* BOA had no right to profits or dividends, the Complaint and Agreement reveal that by investing in the Series Note rather than loaning funds to CFS directly, BOA obtained a significant benefit not accorded to CFS's general unsecured creditors. The Series Note entitled BOA to be repaid from pools of Loans that were transferred by CFS into a remote entity, which shielded those assets from CFS's general unsecured creditors.[29] CFS's securitization investors were to reap the benefits of the segregated collateral to the exclusion of CFS's general unsecured creditors. Relevant to whether the Series Note should be characterized as a security under Section 510(b), and thus subordinated, is the inequitable consequence of permitting BOA to make a claim against CFS's *unsegregated assets,*

the unambiguous definition of "claim" contained in section 101(5). Statutory language must control over this confused and confusing bit of legislative history. *Id.* at 844.

28. "[P]roperty interests are created and defined by state law ... unless some federal interest requires a different result." *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). There is substantial debate regarding whether an unadjudicated claim for rescission and the restitutionary remedy of constructive trust creates a prepeti-

tion property interest in the property claimed or is merely a prepetition claim seeking a "right to an equitable remedy" within the scope of Section 101(5)(B) of the Bankruptcy Code. *See CRS Steam, Inc.,* 225 B.R. at 840–42.

29. The Court notes as an aside that in CFS's bankruptcy case, no interested party sought to bring the trust assets into the bankruptcy estate through substantive consolidation or otherwise.

diluting the general unsecured creditors' potential recovery yet a second time.

The Court finds that the Series Note, as it is described in the Agreement, is a security encompassed by the language of Section 510(b).[30] *See also Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 260 B.R. 517 (10th Cir. BAP 2001) (debt instruments were securities for the purposes of Section 510(b)).

BOA contends that the Note's issuer, the Series Trust, is not an affiliate of CFS. The Bankruptcy Code defines the term "affiliate" as, among other things, a "person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor...." 11 U.S.C. § 101(2)(C). The Agreement clearly contemplates that the Loans were to be administered and collected by CFS as a servicer. CFS, in its Sur–Surreply, states—

> ... BOA disputes ... that CFS operates the business and substantially all of the assets of the Series Trust under an operating agreement because the Pooling and Servicing Agreement involves the servicing, management and operation of the GREAT Master Trust. Sur., at 17–18 n. 13. BOA ignores the supplement to that agreement providing for the servicing, management and operation of the Series Trust.

Sur–Surreply at 11 n. 10. It is possible that the Series Trust is an affiliate of CFS, but since neither the Pooling and Servicing Agreement nor its supplement were incorporated into the Complaint, or are otherwise before the Court in this proceeding, the Court cannot determine as a matter of law that the Series Note is a security of the debtor or a security of an affiliate of the debtor.[31] Accordingly, the Court is not in a position to determine at this stage that BOA's claim falls within the parameters of claims subordinated by Section 510(b).

Thus, notwithstanding the stellar briefing by the parties in advocating their positions regarding the supremacy of Section 510(b) or 541(d) of the Bankruptcy Code, the Court does not and cannot resolve that vexing issue today. Because it is possible that BOA could present a set of facts that would exclude BOA from the reach of Section 510(b) altogether because the issuer of the Series Note is not an affiliate of CFS, the Complaint cannot be dismissed under the auspices of Section 510(b).

> C. *Must the Complaint meet the particularity requirements for pleading fraud, and if so, did BOA succeed in pleading fraud with particularity as required by Rule 9(b)?*

While CFS alleges that BOA has not pleaded with particularity facts sufficient to satisfy all elements of a fraud claim,

---

**30.** In the Complaint, BOA refers to the Series Note as the "Investment." Complaint at ¶ 10. Further—

The name "securitization" comes from the fact that very often the form of instrument that the parties use to obtain funds from the ultimate investor is a security. More precisely, once the parties have packaged the applicable financial assets and issued the instruments, the proceeds of which will finance the liquidation of the financial assets, the instruments will normally be in the

form of commonly known securities such as preferred stock, bonds, beneficial interests in trusts, or commercial paper or other evidences of short-term indebtedness.

1 J. Kravitt and Mayer, Brown & Platt, SECURITIZATION OF FINANCIAL ASSETS, § 1.02 at 1–9 (2001).

**31.** A further issue of fact not clear from the Complaint is whether the Series Trust is a "person" within the definition of Section 101(2)(C).

including materiality of the misrepresentations and loss incurred by virtue of the alleged fraud, BOA contends that in order to prevail on its constructive trust claim, it need only allege "wrongdoing" and need not allege all elements of fraud.

 Under Oklahoma law, the state law that the parties appear to agree applies to BOA's constructive trust claim, pleading any type of unconscionable conduct is sufficient to state a claim that a transaction tainted with such unconscionable conduct may be rescinded and restitution be made to the extent that property or funds unconscionably obtained are traceable. *See e.g., Easterling v. Ferris*, 651 P.2d 677, 680 (Okla.1982). In *Easterling*, the Oklahoma Supreme Court stated a constructive trust may be—

> imposed against one who "by fraud, actual or constructive, by devices or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy."

*Id., quoting Cacy v. Cacy*, 619 P.2d 200 (Okla.1980). The *Easterling* Court summarized Oklahoma cases in which a constructive trust was imposed (*i.e.*, on wrongfully appropriate funds which were to be divided among a decedent's heirs; on property acquired by a conspiracy to depress the price on a guardianship sale; on funds diverted through a joint venture) and those in which a constructive trust was not imposed (*i.e.*, on public property for failure to pay a materialman; for breach of oral promise to convey property in consideration for services rendered; where decedent broke family tradition by failing to devise family bible to oldest son). *Id.* at 680–81 (citations omitted).[32]

In *United States Dept. of Energy v. Seneca Oil Co. (In re Seneca Oil Co.)*, 906 F.2d 1445 (10th Cir.1990), a panel of the circuit also interpreted Oklahoma law on constructive trusts as requiring "active wrongdoing," but concluded that such active wrongdoing was not limited to actual fraud or a breach of a fiduciary duty as urged by the appellants. The *Seneca* panel concluded that the defendant's knowing violations of federal law in overcharging for oil was the type of "active wrongdoing" that warranted the imposition of a constructive trust, notwithstanding that such overcharging was not accomplished by fraud or a breach of fiduciary duty.[33] *Id.*

**32.** In *Easterling*, the Oklahoma Supreme Court further stated that "[a] mere preponderance of the evidence is not sufficient to establish a constructive trust but it must be established by evidence which is clear, definite, unequivocal and satisfactory, or such as to leave but one conclusion, or as to leave no reasonable doubt as to the existence of the trust;" the "rationale behind such a strict standard of proof is to protect the security of titles." *Easterling*, 651 P.2d at 681, *citing Perdue v. Hartman*, 408 P.2d 293 (Okla.1965) and *Regal v. Riegel*, 463 P.2d 680 (Okla.1969). While clear and convincing evidence must be presented at trial in order to prevail on a constructive trust theory, it is sufficient to generally allege wrongdoing or inequitable conduct to survive a motion to dismiss.

**33.** One commentator describes a transaction procured by inequitable conduct in terms of whether the transfer by the "wronged party" was consensual. The possibility of a constructive trust remedy arises when a "transferee" takes property of a "transferor" without asking for consent (*i.e.*, conversion, trespass, infringement, embezzlement); when a transferor voluntarily confers a benefit on the transferee in circumstances that render payment for the benefit equitable (*i.e.*, services provided in an emergency, payment of tax or mortgage by one of several co-owners of property); and finally when a transferor's consent to transfer property was not sufficiently voluntary (*i.e.*, the transfer was induced by fraud, mistake, coercion, undue influence, etc.). *See* Andrew Kull,

at 1450–51. *Accord Golden Budha Corp. v. Canadian Land Co. of America, N.V.,* 931 F.2d 196, 202 (2d Cir.1991) (applying New York law) ("[w]hat is required, generally, is that a party hold property 'under such circumstances that in equity and good conscience he ought not to retain it'"; neither fraud nor breach of fiduciary duty was required to be pleaded).

 Thus, while BOA is correct that pleading "wrongdoing" or inequitable conduct is generally sufficient to state a claim, the Court concludes that if that wrongdoing or inequitable conduct is a species of fraud, Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)") must be satisfied to survive a motion to dismiss under Rule 12(b)(6).[34] Rule 9(b) provides—

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Rule 9(b) does not limit its reach to fraud claims for *damages*, but applies equally to allegations of fraud in support of rescission and restitution. The principal purpose of Rule 9(b) is to afford a defendant fair notice of the plaintiff's claim and the factual ground upon which it is based. Rule 9(b) also safeguards a defendant's reputation from improvident charges of fraudulent behavior. *See Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.,* 1995 WL 608323 (S.D.N.Y.1995), *quoting Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). "Rule 9(b) is not intended to be 'an insurmountable hurdle for [claimants] to overcome;' [t]he complaint must give the party adequate notice of the charges—'it need not marshall [sic] all the evidence against him.'" *Lehman,* at *3.

 Generally, Rule 9(b)'s requirement that "circumstances constituting fraud" be pleaded with particularity means that the plaintiff must specify the source, time, place, manner and content of allegedly fraudulent representations, and the consequences thereof. *See, e.g., In re Exabyte Corp. Securities Litigation,* 823 F.Supp. 866, 869 (D.Colo.1993); *see also Nolan Bros., Inc. v. United States,* 266 F.2d 143, 145–46 (10th Cir.1959) (plaintiff stated a claim for fraud even without using the word "fraud"; allegations of fact which were proven at trial constituted fraud). The Court finds that BOA provided in sufficient detail the source, time, place, manner and content of the alleged misrepresentations and material omissions of fact and BOA's actions in consequence thereof in ¶¶ 13–35 of the Complaint.

 In addition to conforming to Rule 9(b) by adequately pleading "circumstances," a complaint alleging fraud as the sole predicate for a constructive trust must allege all elements of fraud to avert a Rule

---

RESTITUTION IN BANKRUPTCY: RECLAMATION AND CONSTRUCTIVE TRUST, 72 Am.Bankr.L.J. 265, 277–78 (1998). *See also* Emily K. Sherwin, CONSTRUCTIVE TRUSTS IN BANKRUPTCY, 1989 U.Ill. L.R. 297, 335–337, 350–55. Kull views the remedy of constructive trust as the avoidance of the voidable title in property that a wrongdoer obtained without the wronged party's *voluntary* consent. Sherwin's earlier analysis is more sharply focused—whether the wronged party's consent is voluntary may depend upon that party's sophistication and experience, the nature of the transaction, whether the wronged party voluntarily chose to deal with the debtor, and whether the party should be held to have anticipated or assumed the risk that caused the loss. *Id.* at 350–55.

**34.** Bankruptcy Rule 7009 incorporates Rule 9(b) as applicable in adversary proceedings.

12(b)(6) dismissal.[35] *See Exabyte,* 823 F.Supp. at 869, n. 2.

CFS suggests that the Complaint indicates that BOA merely assumed, without any basis, that the historical recovery data provided in the Due Diligence Book consisted solely of collections and settlements, and that the Complaint fails to indicate the source of a duty on the part of CFS to affirmatively disclose that the data also included bulk sales of Loans. CFS's Motion to Dismiss at 16–17.

 The elements of common law fraud under Oklahoma law are:

> 1) a false material misrepresentation; 2) made as a positive assertion which is either known to be false, or made recklessly without knowledge of the truth; 3) with the intention that it be acted upon; and 4) which is relied upon by a party to one's detriment.

*Brown v. Founders Bank and Trust Co.,* 890 P.2d 855, 862 n. 17 (Okla.1994). The concept of fraud also encompasses the situation in which material facts are concealed or omitted where there is a duty to disclose such material facts in order to make other representations not misleading.

> Under Oklahoma law, fraud may occur when one volunteers to speak and provides information to influence another but fails to disclose the whole truth. Thus in *Uptegraft v. Dome Petroleum Corp.,* 764 P.2d 1350, 1353–1354 (Okl. 1988), the court noted:
>
> > Although a party may keep absolute silence and violate no rule of equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party,

he is bound to disclose the whole truth.

*Ragland v. Shattuck Nat'l Bank,* 36 F.3d 983, 991 (10th Cir.1994). *See also Deardorf v. Rosenbusch,* 201 Okla. 420, 422, 206 P.2d 996, 998 (1949) ("A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth."). Thus, intentionally creating a *false impression* by disclosing some facts and concealing others to the detriment of a party relying on such false impression is actionable fraud. *See Uptegraft,* 764 P.2d at 1353.

The Complaint sufficiently pleads circumstances that could impose a duty upon CFS to fully disclose the components of its recovery data and a duty to speak the truth when directly questioned about the cause of the March 1998 slump in collections. Thus, CFS's charge that BOA does not allege facts that create a duty to disclose the bulk sales is not well taken.

 CFS contends that because the Complaint fails to specify how CFS's alleged misrepresentations were material to BOA's decision to purchase the Note, BOA fails to plead a necessary element of fraud. In the context of securities sales—

> [f]or an undisclosed fact to be material, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information

---

**35.** In its Motion to Dismiss, CFS refers the Court to several cases in which a fraud claim is alleged pursuant to state and federal securities statutes. Although BOA alleges it was induced by fraud in the purchase of a securi-

ty, it does not purport to seek relief under federal or state securities laws, and therefore the Court does not hold BOA to the more stringent pleading rules associated with such claims.

made available.'" *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Material facts include those that "affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities." *S.E.C. v. Texas Gulf Sulphur, Co.,* 401 F.2d [833] at 849 [(2d Cir.1968) (en banc)].... Summary judgment may not be granted on the ground that alleged omissions are immaterial "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

*Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 180 (2d Cir.2001). The Tenth Circuit Court of Appeals uses the following standard in evaluating materiality at the pleading stage—

> In the securities context, Rule 12(b)(6) dismissals are difficult to obtain because the cause of action deals primarily with 'fact-specific inquiries' such as materiality.... Nonetheless, courts do not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are *plainly immaterial,* or where the plaintiff has failed to allege with particularity circumstances that could *justify an inference of fraud* under Rule 9(b).

*Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th Cir.1997) (emphasis added).

BOA has alleged that it would not have entered into the Agreement or purchased the Note had it known that the recovery histories of prior securitizations represented by CFS included bulk sales of Loans to a related entity or if it had known that the markedly lower collections for March 1998 occurred not because of a personnel restructuring, as represented by CFS, but because CFS failed to close a bulk sale of Loans to DIMAT during that month. Complaint ¶ 41. Materiality cannot be determined in a vacuum; it is an intensely fact-dependent exercise. The Court cannot say that the alleged undisclosed facts were not related to "the probable future of the company" or could not "affect the desire of investors to buy, sell, or hold the company's securities." Thus, the alleged non-disclosures are not "plainly immaterial."

 CFS also contends that BOA fails to allege that BOA suffered a loss or injury that was proximately caused by the fraud. "In order to secure relief on the basis of fraud, the person seeking redress must have been damaged. Fraud, without injury, is not actionable at law or in equity." *White v. Adoption of Baby Boy D,* 2000 OK 44, ¶ 51, 10 P.3d 212, 223, *quoting Bridges v. Bridges,* 1975 OK 170, ¶ 6, 544 P.2d 493, 494. *See also Hollis v. Hollis,* 1946 OK 246, 172 P.2d 999. In addition, the injury must shown to be proximately caused by the fraud. *See, e.g., Burkhart Grob Luft und Raumfahrt GmbH v. E-Systems, Inc.,* 257 F.3d 461 (5th Cir.2001) (constructive trust could not be imposed on account of fraudulent conduct where claimant failed to prove any injury proximately caused by the fraud).

 The Complaint does not directly allege the specific injury BOA claims to have suffered. In light of the fact that BOA does not seek damages, but rather seeks rescission and restitution by virtue of the equitable doctrine of constructive trust, BOA need not allege damages. A constructive trust claim based on fraud must at a minimum allege some loss or detriment that justifies invoking equity to avoid the transaction, however. In viewing the Complaint liberally, as the Court

must, it finds that notwithstanding the lack of a separate paragraph alleging that non-disclosure of the bulk sales resulted in a loss to BOA, the Complaint as a whole provides enough information to reasonably infer that the $189 million Series Note purchased by BOA in reliance upon representations that the Note would be repaid through CFS's superior collection efforts— an impression that might be drawn from historical recovery data contained in the Due Diligence Book and from the explanation that the March 1998 anomaly occurred because of the reassignment of personnel—was lower in quality and value than the investment BOA believed it was purchasing. *See, e.g., Castellano,* 257 F.3d at 187, *quoting Suez Equity Investors v. Toronto–Dominion Bank,* 250 F.3d 87, 96 (2d Cir.2001) ("a liberal reading of the complaint reveals allegations that the misrepresentations [regarding Mallick's background] led plaintiffs to appraise the value of SAM Group securities incorrectly by assuming the competency of Mallick, the Group's principal"). The Complaint contains sufficient factual allegations to support an inference of detriment or loss to BOA.[36]

 To find that misrepresentations or material omissions of fact were the "proximate cause" (or "legal cause") of a loss or injury, a factfinder must conclude the injury sustained was reasonably foreseeable. Section 548A of the Restatement (Second) of Torts (1977) explains the concept of proximate cause in connection with fraud claims as follows—

A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if,

but only if, the loss might reasonably be expected to result from the reliance.

Comment *a* to Section 548A states:

Causation, in relation to losses incurred by reason of a misrepresentation, is a matter of the recipient's reliance in fact upon the misrepresentation in taking some action or in refraining from it. . . . Not all losses that in fact result from the reliance are, however, legally caused by the representation. In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the *foreseeable risk of harm that it creates* . . . .

Id. (emphasis added). Comment *b* to Section 548A is particularly relevant to this proceeding:

Pecuniary losses that could not reasonably be expected to result from the misrepresentation are, in general, not legally caused by it and are beyond the scope of the maker's liability. This means that the matter misrepresented must be considered in the light of its tendency to cause those losses and the likelihood that they will follow. Thus, when one who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market, because that is the obviously foreseeable result of the facts misrepresented.

*Id. See also AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202, 210–20 (2d Cir. 2000), for a thorough discussion of various tests utilized in the Second Circuit to determine the "proximate cause" of losses

---

**36.** Although outside the scope of the record for the purpose of these motions to dismiss, the Court cannot ignore that the Court itself has confirmed CFS's Plan of Orderly Liquidation wherein it is clear that the Series Note will not be paid in full according to its terms.

suffered by investors on account of alleged fraud, citing, among other authorities, Section 548A of the Restatement (Second) of Torts. See, further, the discussion of "proximate cause" applicable to common law torts versus "loss causation" applicable to federal securities law violations, contained in the dissenting opinion of Chief Judge Winters. *Id.* at 229–36 (loss causation combines elements of materiality, reliance, and foreseeability, and asks the question: Did the misrepresentation deprive investors of a "bargained-for risk profile"?).

In this case, based upon a very liberal construction of the allegations of the Complaint, a factfinder could conclude that it was foreseeable that BOA might purchase the Series Note based upon a false impression that CFS's collection methods had been hugely successful in prior securitizations, and that the value of BOA's Note would plummet when it became generally known that the prior securitizations' trust assets were being sold to DIMAT in order maintain the aura that Loan collections were meeting or exceeding the base model estimated cash recoveries on such securitizations. On its face, the Complaint does not present any supervening cause that would defeat causation as a matter of law. Thus, the Court finds that the Complaint, although not a model of clarity, alleges sufficient facts from which a finding of proximate cause of a loss may be inferred.

The Court finds that BOA has properly alleged a set of facts that, if proven, could constitute fraud and form the predicate for consideration by the Court of BOA's con-

structive trust claim.[37] Thus, the Court declines to dismiss the Complaint under Rule 9(b) for insufficient pleading of the circumstances of fraud or under Rule 12(b)(6) for failing to plead all essential elements of fraud.

D. *The Complaint fails to state a claim for the imposition of a resulting trust.*

 Under Oklahoma law—

[r]esulting trusts arise where the legal estate in property is disposed of or acquired, not fraudulently or in violation of any fiduciary duty, but the intent appears or is inferred from the terms of the disposition, or from accompanying facts and circumstances, that the beneficial interest is not to ... go to or be enjoyed with the legal title. In such a case, a trust is implied or results in favor of the person for whom the equitable interest is assumed to have been intended, and whom equity deems to be the real owner. Intention and consideration are essential elements of a resulting trust. Intent can be actual, or implied from the nature of the transaction and the facts surrounding it.

*Cacy v. Cacy,* 619 P.2d 200, 202–03 (Okla. 1980). Nothing in the Complaint or its attachments can be construed, even in the light most favorable to BOA, to suggest that BOA and CFS intended that CFS was not to obtain the full use and benefit of BOA's payment of $189 million to CFS, or that BOA would maintain any beneficial ownership in the payment. To the extent

---

**37.** If BOA can prove all elements of common law fraud, the ultimate remedy BOA seeks is equitable and will require a subsequent contextual consideration and weighing of all relevant equities. *See, e.g., Torres v. Eastlick (In re North American Coin & Currency, Ltd.),* 767 F.2d 1573, 1575 (9th Cir.1985) (bankruptcy court need not recognize constructive trust

that could be established by state law when federal bankruptcy policies outweigh the interests of the defrauded claimants; constructive trust "is a remedy, flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seem to call for it.")

that BOA seeks the remedy of a resulting trust, the Court concludes that BOA's Complaint fails to state a cognizable claim. Therefore, BOA's request that the Court impose a resulting trust must be dismissed.

## VI. Conclusion

CFS's and the ABS's Motions to Dismiss are denied as to BOA's constructive trust claim and granted as to BOA's alternative resulting trust claim. CFS shall file its Answer to the Complaint within twenty (20) days of the entry of this Order.